[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 727 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 728 
The proceeding which is involved herein had for its purpose the obtaining of a judgment declaring valid certain bonds authorized to be issued at an election held pursuant to the provisions of a statute known as the Municipal Utility District Act (Stats. 1921, p. 245). Judgment was rendered in favor of the validity of the bonds, and the defendants have appealed therefrom.
No question is raised regarding the regularity of the proceedings up to the time of the adoption of the ordinance calling the election for the authorization of the issuance of the bonds; but appellants urge that, because by the general terms of the statute, the ordinance calling the election could not go into effect within less than thirty days after its passage, and because of the fact that the election was actually held twenty-one days after the passage of said ordinance, the election was invalid, and, consequently, that no authority existed for the issuance of the bonds.
It appears that on October 14, 1924, in purported accordance with the requirements of the statute, the directors of the plaintiff organization enacted "an ordinance ordering, calling and providing for, and giving notice of, an election to be held in the East Bay Municipal Utility District, State of California, on Tuesday, November 4, 1924, for the purpose of submitting to the qualified electors of said district the proposition of incurring a bonded debt by said district for the construction, completion and acquisition by said district of a source of water supply from the Mokelumne River and other properties to be used by said district for acquiring and impounding water for said district and conveying the same thereto . . . and this ordinance and *Page 729 
such publication thereof shall constitute notice of said election . . ."
As is said by appellants Read and Hays, in their opening brief, the procedure set forth in the ordinance "is the complete plan prescribed by the legislature whereby the district is to be protected against hasty and ill-considered action. It is the only provision made for adequate notice"; and it is apparent from the ordinance that its only purpose was to give notice of the election.
The general language of the statute, found in one of its sections, which, it is claimed by appellants, affects the validity of the ordinance and ultimately the election, is:
"Sec. 10. The board of directors shall act only by ordinance or resolution . . .
"No ordinance passed by the board shall take effect within less than thirty days after its passage . . ."
The particular section of the statute, however, which provides for the entire procedure relating to the plan of acquiring a public utility, and, as incidental thereto, the preparation of an ordinance by the board of directors of the district providing for the submission to the electors thereof of the question of the issuance of bonds for the ultimate purpose of financing the proposition, contains, among other things, the following provision (sec. 15, subd. 4):
"The ordinance calling such election shall recite the objects and purposes for which the indebtedness is proposed to be incurred, the estimated cost of the proposed public improvements, the amount of the principal of the indebtedness to be incurred therefor, and the rate of interest to be paid on said indebtedness, and shall fix the date on which such election will be held, the manner of holding such election and the voting for or against incurring such indebtedness, and in all particulars not recited in such ordinance, such election shall be held as provided in the act entitled `An Act authorizing the incurring of indebtedness by cities, towns, and municipal corporations for municipal improvements, and regulating the acquisition, construction, or completion thereof,' statutes 1901, page twenty-seven."
It is the contention of the respondent that, by virtue of the language of the statute to which reference has just been had, the notice of the election to be given to the electors *Page 730 
of the district is governed by the provisions of said Statutes of 1901, page 27, as follows (sec. 3):
"Such ordinance shall be published once a day for at least seven days in some newspaper published at least six days a week in such municipality, or once a week for two weeks in some newspaper published less than six days a week in such municipality, and one insertion each week for two succeeding weeks shall be a sufficient publication in such newspaper published less than six days per week. In municipalities where no such newspaper is published, such ordinance shall be posted in three public places therein for two succeeding weeks. No othernotice of such election need be given."
If the respondent is correct in its contention there can be no question, so far as this particular point is concerned, as to the validity of the election. It thus becomes of importance to determine which of the two provisions of the statute applies to this case.
The Statute of 1901, page 27, is frequently referred to as the Municipal Bond Act. Its predecessor was the Municipal Bond Act of 1889 (Stats. 1889, p. 399). With reference to the latter act it has been said by this court: "The whole proceeding from beginning to end is a single special proceeding for the accomplishment of a single special purpose, though consisting of a series of acts." (Derby v. Modesto, 104 Cal. 515, 521 [38 P. 900, 902].) That language is applicable to the provisions of the act here under consideration. Those provisions (together with its reference to the Statutes of 1901, p. 27) present in a single section of the act a complete plan for the "acquisition, construction or completion" of a public utility. In effect, it therefore becomes a special act in itself, as distinguished from the general provisions of the entire statute. It follows that if the special provisions of the section of the act having to do with the calling of the election, together with the reference therein contained to the act of 1901, page 27, are broad enough to cover the matter of giving notice of the election, the general provisions of the act in question relating to the time within which ordinary ordinances passed by the board of directors of the respondent corporation shall take effect must give way, and permit the special provision for *Page 731 
giving notice of the election to take effect and be controlling in the premises.
In the case entitled In re Rouse, Hazard Co., 91 Fed. 96, 100 [33 C.C.A. 356, 360], it was said: "It is an elementary principle of construction that where there are in one act or in several acts contemporaneously passed specific provisions relating to a particular subject, they will govern in respect to that subject as against general provisions contained in the same act."
The same principle is announced in State v. WashburnWaterworks Co., 182 Wis. 287 [196 N.W. 537, 539], as follows: "That rule is that a specific provision in a statute relating to a particular subject must govern in respect to that subject as against general provisions in other parts of the statute which might otherwise be broad enough to include it."
And in Sanford v. King, 19 S.D. 334, 339 [103 N.W. 28, 30], the language used by the court is: "It is an old and familiar rule that where there is in the same statute a particular enactment and also a general one, which in its most comprehensive sense would include what is embraced in the former, the particular enactment must be operative, and the general enactment must be taken to affect only such cases within its general language as are not within the provisions of the particular enactment."
To the same effect, see: Estate of Hellier, 169 Cal. 77, 82 [145 P. 1008]; King v. Armstrong, 9 Cal.App. 368, 371 [99 P. 527]; Miller v. Engle, 3 Cal.App. 325, 330 [85 P. 159]; Los Angeles v. Los Angeles Pacific Co., 31 Cal.App. 100
[159 P. 992]; D'Esterre v. City of New York, 104 Fed. 605, 610 [44 C.C.A. 75]; State v. Hobe, 106 Wis. 411
[82 N.W. 336, 340]; Dahnke v. People, 168 Ill. 102 [39 L.R.A. 197, 48 N.E. 137, 140]; Kepner v. United States, 195 U.S. 100, 125 [1 Ann. Cas. 655, 49 L.Ed. 114, 24 Sup. Ct. Rep. 797, see, also, Rose's U.S. Notes].
In addition to the reference in the act under consideration to the act of 1901, page 27, which reference has been quoted herein, the act in question contains the following provision (sec. 15, subd. 4):
"All matters and things pertaining to the issuance of bonds by such district including the form, limit of denomination, *Page 732 
interest, redemption and sale of said bonds, not otherwise provided herein, shall be in accordance with the provisions of said last named act as near as the same may be made applicable."
Considering such language together with that part of the section of the act here under consideration, heretofore set forth herein, and, furthermore, taking into consideration therewith the fact that all that part of said first quoted language to, but not including, the reference to the Statutes of 1901, page 27, is an exact copy of the language of that act which immediately precedes the part thereof which provides for the notice of the election to be given, it is apparent that it was the intention of the legislature, in passing the act in question, that the entire procedure, with reference to the calling of an election for the authorization of the issuance of bonds in a municipal utility district, should be identical with the procedure outlined in the Municipal Bond Act, as provided in the Statutes of 1901, page 27. As heretofore stated, that statute is the successor of the Municipal Bond Act of 1889 (Stats. 1889, p. 399), as amended in 1891 (Stats. 1891, p. 94), the importance of which fact, so far as the question now before the court is concerned, being shown by the decision of this court in the case of Derby v. City ofModesto, 104 Cal. 515 [38 P. 900]. In that case the validity of certain bonds issued by the city of Modesto was the matter before the court. That city was a city of the sixth class, to which, at least generally speaking, in the matter of the adoption of said ordinances, the provisions of section 861 of the Municipal Government Act (Stats. 1883, pp. 93, 269) applied. That section, so far as is here applicable, provides that "No ordinance, and no resolution granting any franchise for any purpose, shall be passed by the Board of Trustees on the day of its introduction, nor within five days thereafter, nor at any other than a regular meeting."
The provisions of the Municipal Bond Act (Stats. 1889, p. 399, as amended by Stats. 1891, p. 94), relating to the adoption of an ordinance with reference to the "acquisition, construction or completion" of any municipal improvement and the calling of an election for the purpose of determining whether or not the city should incur an indebtedness on account of such improvement, were as follows: *Page 733 
"Section 2. Whenever the legislative branch of any city, town, or municipal corporation shall, by ordinance passed by a vote of two thirds of all its members, and approved by the executive of said city, town, or municipal corporation, determine that the public interest or necessity demands the acquisition, construction, or completion of any municipal buildings, bridges, waterworks, water rights, sewers, or other municipal improvements, the cost of which will be too great to be paid out of the ordinary annual income and revenue of the municipality, they may, after the publication of such ordinance for at least two weeks in some newspaper published in such municipality, and at their next regular meeting after such publication, or at an adjourned meeting, by ordinance passed by a vote of two thirds of all its members, and also approved by the said executive, call a special election and submit to the qualified voters of said city, town, or municipal corporation, the proposition for the purpose set forth in the ordinance, and no question other than the incurring of indebtedness for said purpose shall be submitted."
It will thus be seen that the requirement of the general law to the effect that no ordinance should be passed on the day of its introduction, nor within five days thereafter, conflicted with the provision, contained in the act there in question, that the ordinance might be passed at the next regular meeting, or at an adjourned meeting, of the board of trustees of the city. Each of the necessary ordinances relating to and preceding the election was passed by the board of trustees on the day on which it was introduced; and it was contended in this court by counsel appearing against the validity of the bonds that such fact rendered each of such several ordinances void, and, consequently, that neither of such ordinances constituted a valid step in the proceedings leading up to the issuance of the bonds. In affirming the validity of the bonds, and, incidentally, the legality of the ordinances, the court said (p. 520):
"Ordinance No. 111 providing for the issue, sale, and redemption of the bonds, ordinance No. 113 amending No. 111, and No. 115 approving and confirming the execution of the bonds and the sale thereof to the respondent, the Oakland Bank of Savings, were all proper steps taken by the board in carrying out the expressed will of the voters and authorized *Page 734 
under the act of 1891, and were not affected by the supposedrestriction in section 861 of the act of 1883. The purpose of said section 861, so far as it requires ordinances to be introduced at least five days before their passage, is to give time for consideration, with a view to prevent hasty and ill-considered legislation; but the act of 1891 goes far beyond this requirement by providing that the first ordinance, which has no effect whatever unless followed by the other steps required by the statute, must be published for two weeks. The whole machinery of the act is framed with a special view to the intelligent action of the voters of the municipality in whose hands rests the power to authorize or refuse to authorize the incurring of the proposed indebtedness. The whole proceeding from beginning to end is a single special proceeding for the accomplishment of a single special purpose, though consisting of a series of acts; whilesection 861 of the Municipal Government Act relates to theordinary and general legislation passed by the government of themunicipality, if it be true, as appellant contends, that it applies to ordinances other than those granting franchises."
The analogy between that case and the case at bar is evident. In each of them the question of whether the general law or the provisions of the special act should prevail is paramount. Unless the language employed by the section of the act here in question, in the reference to the provisions of the Statutes of 1901, page 27, is limited in its intent and meaning to something considerably less than is apparent on its face, the decision in the case of Derby v. Modesto should control the ruling by this court.
The Statutes of 1921, page 245, which is here being considered, contains requirements identical with Statutes of 1901, page 27, with reference to the matters to be stated in the ordinances providing for the calling of the election — following which (still identical with the provisions of the act of 1901, page 27) it provides that "in all particulars not recited in such ordinance, such election shall be held as provided in the act . . . of 1901, page twenty-seven."
Counsel for appellants point to the word "held," as contained in the phrase "such election shall be held as provided in the act" (Stats. 1901, p. 27), and seek to have it construed as meaning that the procedure outlined in said statute *Page 735 
for the conduct of an election be limited to the very day on which the election took place. If there were nothing else, the additional language of the act occurring in the second sentence, that "all matters and things pertaining to the issuance of bonds by such district . . . shall be in accordance with the provisions of said last named act" (Stats. 1901, p. 27), would seem sufficient to indicate that a proper construction of the word, to which attention has been directed by appellants, would not confine its reference simply to the day of the election, but would include as well the several necessary steps leading thereto.
But even assuming that which seems unjustified, to wit, that the legislature intended the reference to the Statutes of 1901, page 27, to be applied merely to the procedure on the day on which the election was to be held, in view of the admission by appellants in their brief that the sole purpose of the provision found in the detached section of the act in question, to the effect that no ordinance passed by the board of directors of the plaintiff organization should take effect within less than thirty days after its passage, was to supply "a definite period for the consideration and deliberation of the electorate," the fact that a very large percentage of the registered voters voted at the election, and that the proposition carried by a vote of 81,919 in favor thereof, as compared with 31,998 opposed thereto — and also taking into consideration the further provision of the statute in question, that "the court hearing any proceeding or action inquiring into the regularity, legality or correctness of the proceedings leading up to the issuance of bonds or the validity of such bonds must disregard any error, irregularity, or omission which does not affect the substantial rights of the parties to said action or proceeding" — it would seem that appellants' contention cannot be sustained, at least so far as the point that the election was void because of the fact that thirty days had not elapsed between the time the ordinance was passed and the date of the election.
It is a settled rule of law, as announced in principle in the cases of Chase v. Trout, 146 Cal. 350, 358 [80 P. 81], and Watkinson v. Vaughn, 182 Cal. 55 [186 P. 753], and cases therein cited, that the legislative power which prescribes the procedure to be pursued in any given proceeding may also legally provide that an irregularity *Page 736 
("jurisdictional" or otherwise, where it does not involve "due process"), consisted of a failure to carry out the directions in the legislative act as to such procedure, will not render void the object sought to be attained. (See, also, Los Angeles CountyFlood Control District v. Hamilton, 177 Cal. 119, 131 [169 P. 1028]; Miller Lux v. Board of Supervisors, 189 Cal. 254, 275 [208 P. 304]; Miller Lux v. Secara, 193 Cal. 755, 770 [227 P. 171]; City Street Imp. Co. v. Watson,50 Cal.App. 687, 691 [195 P. 967]; Chapman v. Rodolph,58 Cal.App. 223, 236 [208 P. 370].)
The provision of the act, in substance, that, in determining the legality of the proceedings leading up to the issuance of the bonds, the court must disregard any error, irregularity, or omission which does not affect the substantial rights of the parties to the proceeding, would seem broad enough, considering the evidence covering the matter (hereinafter set forth in part), to cover any defect in the procedure adopted which might affect the "definite period for the consideration and deliberation of the electorate" on the question submitted to it.
It is beyond question that the general provision of the statute, that "no ordinance passed by the board shall take effect within thirty days after its passage," if at all applicable to the ordinance calling the election, was for the purpose of allowing a sufficient time to elapse in order that the qualified voters might have knowledge or notice of the election.
The section of the act which appellants claim has application to the notice of the election provides for the thirty-day notice by publication. There were, however, but twenty-one days intervening between the date of the passage of the ordinance calling the election and the date of the election. Of those twenty-one days no complaint is made. It is to the remaining nine days which, in addition to the twenty-one days, it is claimed, should have preceded the election, that attention is directed, and which, it is contended, resulted in an insufficient notice being given to the electors of the district.
The requirement of the statute is that the court "must disregard any error, irregularity, or omission which does not affect the substantial rights of the parties to said action or proceeding." The trial court found on the evidence that: *Page 737 
"No error or irregularity or omission in the proceedings for the authorization of or leading up to the issuance of said bonds of the said district of the par value of $39,000,000 affects or has affected any substantial right or rights of the parties defendant, or any of them.
"Each of the defendants had full notice that the said proposition for the issuance of said bonds was submitted to the electors of the district at the election to be held on said 4th day of November, 1924, and voted upon the said proposition at said election.
"The said vote at the said election in favor of the said proposition for the incurring of the said indebtedness of $39,000,000 by the said district was a full and fair expression of the will of the electors of said district, qualified to vote at said election upon said proposition."
Such finding was, in part, based upon evidence that the county clerk in each of the counties of Contra Costa and Alameda (being the counties in which the district is situate) mailed to each registered elector in the district a sample ballot, together with a card showing the precinct of the voter, a copy of the official ballot for the general election, and a pamphlet containing proposed constitutional amendments. Upon the ballot was stated the bond proposition and the date of the election.
Evidence was also submitted on the trial that, between September 24, 1924, and the date of the election, on November 4, 1924, general publicity of the election was given in all parts of the district through the medium of the newspapers circulating within the district, and through public meetings and discussions held therein; also that 90,000 copies of the summary of the engineers' report on the project and its approval by the board of directors of the district were distributed at residences within the district, and approximately 10,000 copies of such report were circulated at public meetings held therein. It also appeared that between said dates some forty or fifty public meetings were held in the district for the purpose of discussing the advisability of the project and the issuance of bonds for the acquisition thereof; that a canvass of the opinions of prominent men of the community relative to the desirability of incurring the bonded indebtedness for the acquisition of the project was made, and the results thereof published in the newspapers circulated in *Page 738 
the district; and that the newspapers at all times after the filing of the report of the engineers, on September 22, 1924, up to the time of the election, contained numerous articles and editorials relating to the election. Moreover, the election returns showed that a much heavier vote was cast on the bond proposition than was cast at the same time within the said district for any state official or on any other proposition of any sort; also that the vote on the bonds was approximately three times as great as was the total vote cast at a preceding election in the district for the formation thereof and the election of the first board of directors.
It is a well-known fact that the ordinary newspaper notice of a forthcoming election does not, in fact, have the desired effect of notifying the electors thereof. The ordinary qualified voter is so busy attending to his private affairs, and is so apathetic regarding matters touching the public welfare, that a printed newspaper notice of an election to be held, whether in the near or the distant future, even if seen by such voter, excites in him no particular interest. But, in the matter now under consideration, the direct notice of the election received by each registered voter of the district, and the public meetings and discussions "privately and by the newspapers" regarding the proposition of the issuance of bonds would lead to the conclusion, as indicated by the court's findings, that each person in the district entitled to vote at the election not only had constructive notice but actual notice as well that the election was to be held. Such being the case, it is indisputable that the result of the election was not prejudicially affected by the failure to give the extra nine days' notice of the election, as provided, in effect, by the statute; nor did the "error, irregularity, or omission . . . affect the substantial rights of the parties to said action or proceeding."
In the case of People v. Hoge, 55 Cal. 612, it was ruled that even though the election had been improperly called, if it actually had been held (syllabus in part), "the voice of the people is not to be rejected for a defect, or even a want of notice, if they have in truth been called upon and have spoken." Touching the matter at issue the court said (pp. 618, 619):
"It is argued in the first place, that the power to call the election resided in the Board of Supervisors, and the point *Page 739 
is also taken, that action on the part of the Legislature was essential to enforce and give effect to the provision of the Constitution. The first point has already been disposed of, and the second is not, in our opinion, well taken. Legislative action was not necessary to enable the inhabitants of the City and County of San Francisco to act, under sec. 8, art. xi, of the Constitution, in the matter of framing a charter. . . .
"In this connection, the language of the Supreme Court of Iowa appears applicable: `Upon considerations like this, the courts have held that the voice of the people is not to be rejected for a defect, or even a want of notice, if they have in truth been called upon and have spoken. In the present case, whether there was notice or not, there was an election, and the people of the county voted, and it is not alleged that any portion of them failed in knowledge of the pendency of the question, or to exercise their franchise.' (Dishon v. Smith, County Judge, 10 Iowa, 218.)
"We have arrived at the conclusion that the election of March 30th, 1880, should be declared valid, the more willingly for the reason that no possible injury can result from such a determination. The people of the City and County of San Francisco have, after a fair and full election, regularly and honestly conducted, expressed their wish that a charter should be prepared for their ratification, and the charter so prepared by the respondent and his associates must, before it can become a law, receive such ratification, and after that, the approval of the Legislature."
In Rideout v. Los Angeles, 185 Cal. 426 [197 P. 74], it appeared that in a bond election the provisions of the statute had been violated as to the size of type of the ballots, the space for printed instructions to the voters, and the printing of the words "Municipal Ticket" on the ballots. It was held that the election was legal.
In People v. Prewett, 124 Cal. 7 [56 P. 619], which involved an election to fill vacancies on the board of trustees of a school district, it appeared that the notice of the election failed to state the exact purpose, but merely stated that it was to elect trustees. The court ruled that, in view of the fact that a fair election had been held, the defective notice thereof would not vitiate it. It was said: "There is no claim that anyone was prevented from voting either *Page 740 
because of the notice or because the polls were kept open a little less than four hours."
In Preston v. Culbertson, 58 Cal. 198, an election was declared legal where it appeared that in one precinct the election was not held at the place specified in the notice. The court said: "The important question in such cases is, Have the qualified electors been deprived of a fair opportunity of expressing their preference? Mere irregularities which do not affect the final result should be disregarded."
In McCrary on Elections, on page 134, it is said: "While it is true that notice is essential to the validity of an election, it is not always essential that the particular form or manner of giving notice which may be prescribed shall be followed. It is essential that the electors should have notice of the time, place and objects of the election — that is, they should have knowledge of them; but an omission to follow the particular mode provided by statute for publishing such notice may not render the election void, and will not, if the electors have actual notice, and do, in fact, take part in the election."
The point is covered in 20 Corpus Juris, page 96, as follows: "The test for determining whether an election is invalidated for want of a notice prescribed by statute is whether, on the one hand, the voters generally have had knowledge of the election and full opportunity to express their will, or whether, on the other hand, the omission has resulted in depriving a sufficient number of electors of the opportunity to exercise their franchise to change the result of the election."
In Lewis and Putney's Handbook on Election Laws the rule is stated as being ". . . Even in the case of special elections, or elections to fill vacancies, while a notice is invariably required to be issued, still, if there is no notice or proclamation made, but if the size of the vote shows that the voters had general knowledge of the election, the election will be upheld. Where the statute required a certain number of days' notice to be given of the election or designated what facts shall be set out in the notice, these provisions should be complied with, but a substantial compliance with the statute is sufficient."
In the case of Weisgerber v. Nez Perce County, 33 Idaho, 670 [197 P. 562], it appears that an action was commenced *Page 741 
to enjoin the issuance of bonds on the ground, among other things, that notice of the election had not been given for the time provided by the statute. After citing some authorities said to hold that a strict compliance with the statutory requirement was an essential prerequisite to the validity of the election, the court said:
"However, we are of the opinion that the correct rule, and the one supported by the great weight of authority, may be stated as follows: Statutory directions as to the time and manner of giving notice of elections are mandatory upon the officers charged with the duty of calling the election, and will be upheld strictly in a direct action instituted before an election; but after an election has been held, such statutory requirements are directory, unless it appears that the failure to give notice for the full time specified by the statute has prevented electors from giving a full and free expression of their will at the election, or unless the statute contains a further provision, the necessary effect of which is that failure to give notice for the statutory time will render the election void. (Citing thirty authorities.)
"The court found that the electors of the county were fully informed as to the time, place, and purpose of holding the election, and as to the polling place in each precinct where the votes would be received. The court also found that none of the defects above referred to affected the result of the election. It is not averred in the complaint, nor shown by the record, that any elector was deprived of his vote by reason of the fact that notices were not posted the statutory length of time in the five precincts. The court further found affirmatively that none of the electors failed to vote by reason of any of the irregularities mentioned in the complaint.
"We are of the opinion that the election was not illegal or void on account of the defects in the posting of notices in the five precincts of the county."
Each of the cases of Dishon v. Smith, 10 Iowa, 212, and that of State v. Doherty, 16 Wn. 382 [58 Am. St. Rep. 39, 47 P. 958], involved the question of the effect of a defective notice of election. In the former case, among other things, it was said:
"Upon considerations like these the courts have held that the voice of the people is not to be rejected for a defect, or *Page 742 
even a want of notice, if they have, in truth, been called upon and have spoken. In the present case, whether there were notices or not, there was an election and the people of the county voted, and it is not alleged that any portion of them failed in knowledge of the pendency of the question, or to exercise their franchise."
In the latter case, as appears in the opinion of the court: "The clerk complied with section 4 of the ordinance in all particulars, except that he did not post certified copies of the proposed amendments in the different polling places within the city. But the court found that newspaper clippings containing copies of the proposed amendments `were duly posted in all of the voting booths of the city of Tacoma by the election officers at said voting places.' The court also found that notice of the election signed by the city clerk was published in the Tacoma Daily Ledger, the Tacoma Morning Union and the Evening News — all daily newspapers published in said city — from the 28th of March to the 7th day of April, inclusive, and that no other or further notice of such election, nor the election on said proposed amendment, was given. The court found that these newspapers circulated throughout the political divisions of the City of Tacoma, and one hundred and twenty thousand copies were distributed in each and every one of the political divisions and precincts; also,
"`That the said amendments were discussed by the people generally in their homes, from the platform and from the pulpit in the various churches of the city to such an extent that the pendency of said election for the adoption or rejection of said proposed amendments was a matter of public notoriety throughout said city.'"
The court continued: "Having ascertained `that the amendments were discussed by the people generally in their homes . . . to such an extent that the pendency of said election for the adoption or rejection of said proposed amendments was a matter of public notoriety throughout said city,' and having further ascertained by the vote actually polled that the great body of the electors expressed their will upon these amendments, which it was their province to adopt or reject, the conclusion is inevitable that the result of the election was not affected by the fact that a literal compliance with the formalities prescribed by law for giving *Page 743 
notice was not observed. The very purpose for which the statute directed the posting of notices was accomplished when actual knowledge of the election was brought home to the voter, it matters not by what means the knowledge was imparted to him. To hold otherwise would be to disregard the expressed will of the people in a matter which the law has confided to them."
Other cases which are of like effect are: City of Ardmore v.State, 24 Okla. 862 [104 P. 913]; Town of Grove v.Haskell, 24 Okla. 707 [104 P. 56]; Ellis v. Karl,7 Neb. 381; Wheat v. Smith, 50 Ark. 266 [7 S.W. 161]; Demaree v.Johnson, 150 Ind. 419 [50 N.E. 376]; City of Albuquerque v.Water Supply Co., 24 N.M. 368 [2 A.L.R. 519, 174 P. 217];Bauer v. Board, 157 Mich. 395 [122 N.W. 121]; 1 Dillon on Municipal Corporations, 5th ed., sec. 213, p. 431; Hill v.Smithville, etc. (Tex. Civ. App.), 239 S.W. 987; Hearn v.Court of Commrs., 182 Ala. 392 [62 So. 535].
And for further authorities, see Gollar v. City ofLouisville, 187 Ky. 448 [219 S.W. 421], where a bond election was sustained although notice of election was not published the full ten days as prescribed by the statute.
Smith v. State, 84 Okla. 283 [203 P. 1046], and Ratliff
v. State, 79 Okla. 152 [191 P. 1038], in each of which cases it appeared that there was a failure to give the prescribed notice.
Fike v. State, 25 Ohio C.C. 554, where there was a failure to publish proclamation of election for the statutory time.
It is thus apparent that the election itself is the controlling feature and the ultimate objective of the statute. If the election has been honestly and fairly conducted, and no one has been injured by the manner in which the preliminary steps leading thereto have been taken, no reason exists for declaring it invalid. In the instant case there was no evidence offered on the part of the defendants tending to show that they had been prejudicially affected by the procedure which had been adopted and followed leading up to the election. As heretofore set forth, the findings by the court were to the effect that no error or irregularity or omission in the proceedings affected any of the substantial rights of the defendants; that they had full notice that the proposition for the issuance of the bonds would be submitted to *Page 744 
the electors of the district at an election to be held on the said fourth day of November, 1924; and that the vote at such election was a full and fair expression of the will of the electors of the district who were qualified to vote at said election upon said proposition. Those findings, while in some respects possibly subject to appellants' criticism that they are but conclusions of law, nevertheless speak the truth as an ultimate expression by the court of the conditions surrounding the situation.
The books are filled to overflowing with statements of the rule, in substance, that, wherever possible from a standpoint of legal justice to validate an election, it is the duty of the court to do so.
In Rideout v. City of Los Angeles, 185 Cal. 426, 430 [197 P. 74, 75], it is said: "It is a primary principle of law as applied to election contests that it is the duty of the court to validate the election if possible."
In Law v. San Francisco, 144 Cal. 384, 394 [77 P. 1014, 1019], occurs the following: "Universally courts have been reluctant to defeat the fair expression of the popular will in elections, unless the plain mandate of the law permitted of no alternative."
And in People v. Prewett, 124 Cal. 7, 10 [56 P. 619, 620], the court says: "`Elections should never be held void unless clearly illegal. It is the duty of the court to give effect to them, if possible.'"
To the same effect, see 20 Corpus Juris, page 230; Cooley's Constitutional Limitations, seventh edition, page 928.
It would follow, as a conclusion from what has been said, that, as applied to the facts of this case, notwithstanding some authorities to the contrary, as cited in appellants' brief, the failure to give the full thirty days' notice of the election in nowise affected the substantial rights of the defendants in the premises.
It is urged by appellants that because the statute which provides for the calling of the election contains the provision "that no public utility shall ever be acquired or contracted for unless the acquisition of said utility has first been approved by a majority of the electors of said district," an election at which less than a majority of the "registered electors of the district" cast their votes in favor of the issuance *Page 745 
of the bonds does not constitute a compliance with the requirements of the statute so as to authorize the bonds to be issued.
Much might be said in support of appellants' contention. Excerpts from different portions of the statute under consideration would seem to indicate that in the use by the legislature of the words "a majority of the electors of said district" that body was fully aware of the legal significance to be attached thereto, and consequently used such language with discrimination, and adopted it advisedly. It is, however, unquestionable that a literal compliance with such direction would be wholly impracticable, if not impossible. The registry of qualified voters, as provided by law, would not cover the situation. It is plain that electors of a district do not necessarily consist only of all voters who have registered. Many persons who are entitled to vote fail to register. A great public catastrophe, such as, for example, a flood, or a fire, might possibly occur which might destroy the whole, or the greater part, of the district. Many registered voters might lose their lives, and many of the living who remained might be forced to remove from the district in order that they might be properly housed or earn a livelihood; and, in the happening of such an untoward event, the registration list, while showing perhaps thousands of electors entitled to vote, would be utterly unreliable.
The result of a strict interpretation of the provision of the statute would be that, in this particular district containing 196,899 registered electors, without weeks or months of inquiry and special investigation as to who, on the day of the election, were electors of the district, as distinguished fromregistered electors thereof, the outcome of the election could not be ascertained. It was undoubtedly within the province of the legislature to lay down any reasonable conditions for the purpose of ascertaining whether or not a public utility should be acquired; but it would seem unlikely, at least, that any obstacles were intentionally placed in the act for the express purpose of rendering it useless. The difficulties which would attend such situation, while possibly not insurmountable, would be so great that, from a practical standpoint, with full advance knowledge by the electors of the district of the literal requirements of the statute, no election would ever be held, and the act of the legislature would, *Page 746 
therefore, become a nullity. Such an absurdity — that the legislature "with malice aforethought" perpetrated such an outrage on the utility district — is unthinkable. The intention of the legislature was undoubtedly that its laudable endeavor should bear fruit, and not that its labors should be in vain.
In 1 Dillon on Municipal Corporations, fifth edition, section 383, it is stated: ". . . that when by statute a vote of `a majority of the voters' or of `a majority of the legal voters' or of `a majority of the qualified voters' of a municipality is required for election to office or for any other municipal purpose, those who do not vote, acquiesce in the result, and amajority of those actually voting is, unless otherwise specially provided, sufficient, though in point of fact it may not be a majority of all who are entitled to vote . . ."
And in section 891, volume 2, the same author states: "In other cases where the requirement is that the issue be approved by a prescribed majority of the qualified voters of the municipality, or other language of similar import, the decisions usually hold that a vote of the majority of all the qualified voters of the municipality is not required, but only the requisite majority of the qualified voters voting at the election."
In 2 McQuillin on Municipal Corporations, section 418, at page 925, it is said:
"Unless the law provides otherwise, either in express terms or by necessary implication, the preponderance of judicial decisions hold that, if the officer or proposition receives the required number of legal votes cast at the particular election (whether a majority, two-thirds, three-fourths or any other named proportion), the officer will be declared legally elected or the proposition duly carried, notwithstanding, such votes do not constitute the required number when all the qualified voters of the electorate are counted."
In Simonton on Municipal Bonds, page 94, the rule is thus stated: "The constitution or statute usually requires that the matter submitted for popular approval shall receive a majority or some other proportion of the legal or qualified voters.
"The courts in almost every instance have construed this to mean, without reference to any constitutional provision *Page 747 
on the subject, a majority or other required proportion of the legal voters, voting at the election when the question is submitted, unless otherwise provided."
The authorities sustaining the principle thus announced by the text-writers are very numerous. Among them may be cited the following: County of Cass v. Johnston, 95 U.S. 360 [24 L.Ed. 416, see, also, Rose's U.S. Notes]; St. Joseph Township v.Rogers, 83 U.S. (16 Wall.) 644 [21 L.Ed. 328]; Douglass v.Pike County, 101 U.S. 677 [25 L.Ed. 968]; Carroll County v.Smith, 111 U.S. 556 [28 L.Ed. 517, 4 Sup. Ct. Rep. 539].
In Taylor v. Taylor, 10 Minn. 81, a provision was required to be adopted by "a majority of such electors." The court said, in part (p. 88):
"The plaintiff claims that this section requires an absolute majority of those qualified to vote in the county at the time of the election. This construction is perhaps in accordance with the letter of the constitution, but it leads to such practical inconvenience, hardship, and absurdity, we cannot believe it to be in accordance with the spirit and meaning of that instrument. . . . In every case it would be necessary, if this construction is correct, to show by legal evidence the actual number of persons legally qualified to vote in the county at the time of such election, and we are unable to see how this could be determined except by a suit or proceeding in a court qualified to decide authoritatively and finally such questions. The difficulty of making such proof in many cases would be so great as to make it impracticable. . . . When a particular construction of an instrument leads to hardship, inconvenience, or absurdity, the respect due from courts to a co-ordinate branch of the government or to a constitutional convention, will not permit them readily to presume that such construction was intended, and they will under such circumstances a little deviate from the received sense of the words, not because they have a right to disregard the will of the framers of the instrument, but for the purpose of truly arriving at and carrying out their will."
The same construction was placed on similar provisions in the following cases: Bayard v. Klinge, 16 Minn. (Gil. 221) 249, where the provision was "majority of such electors"; Everett v.Smith, 22 Minn. 53 ("majority of such electors"); *Page 748 Shearer v. Board of Supervisors, 128 Mich. 552 [87 N.W. 789] ("by a majority vote of the electors of said county");Attorney-General v. Common Council, 164 Mich. 143
[129 N.W. 44] ("in case the electors shall by majority vote"); Pickett v.Russell, 42 Fla. 634 [28 So. 764] ("a majority of the qualified electors"); Green v. State Board of Canvassers, 5 Idaho, 130 [95 Am. St. Rep. 169, 47 P. 259] ("a majority of the electors"); Foy v. Gardiner Water District, 98 Me. 82
[56 A. 201] ("a majority vote of the legal voters"); Citizens Taxpayers v. Williams, 49 La. Ann. 422 [37 L.R.A. 761, 21 So. 647] ("by a vote of a majority of the property taxpayers"); Taylor v. McFadden, 84 Iowa, 262 [60 N.W. 1070] ("a majority of the voters"); Town of Southington v.Southington Water Co., 80 Conn. 646 [13 Ann. Cas. 411,69 A. 1023] ("a majority of the legal voters"); People v. Warfield,20 Ill. 160 ("a majority of the voters"); Fabro v. Town ofGallup, 15 N.M. 108, 103 P. 271] ("two-thirds of the qualified voters"); Walker v. Oswald, 68 Md. 146 [11 A. 711] ("a majority of voters"); Smith v. Proctor, 130 N.Y. 319 [14 L.R.A. 403, 29 N.E. 312] ("a majority of all the inhabitants . . . entitled to vote"); Cronly v. City of Tucson, 6 Ariz. 235
[56 P. 876] ("two-thirds of qualified voters"); City of Rome
v. Whitestown etc. Co., 113 App. Div. 547 [100 N.Y. Supp. 357] ("majority of the voters"); Bradshaw v. Marmion (Tex. Civ. App.), 188 S.W. 973 ("a majority of the qualified voters");Vance v. Austell, 45 Ark. 400 ("a majority of the qualified voters"); Louisville etc. R.R. v. County Court, 1 Sneed (Tenn.), 637 [62 Am. Dec. 424] ("majority of voters"); Morse v.Granite County, 44 Mont. 78 [119 P. 286] ("majority of electors"); Harby v. Jennings, 112 S.C. 479 [101 S.E. 649] ("majority of the electors"); Mobile Savings Bank v.Oktibbeha, 22 Fed. 580, 24 Fed. 110 ("two-thirds of qualified voters"); Madison County v. Priestly, 42 Fed. 817 ("two-thirds of qualified voters"); Pacific Imp. Co. v. Cityof Clarkdale, 74 Fed. 528 [20 C.C.A. 635] ("two-thirds qualified voters").
There can be no denial of the fact that in several well-considered cases it has been held that, notwithstanding the obvious and extreme difficulties which the situation presents, where the legislature has spoken, and thereby expressly directed *Page 749 
that an election to be valid must be carried by a majority of the electors of any given locality, such mandate must be given full observance. The great weight of authority, however, is to the effect that, because of the utter impracticability of carrying out the legislative fiat as strictly construed, the common-sense meaning of the words "majority of the electors" should be applied, and consequently construed as "majority of the electors voting on the proposition."
The third point suggested by appellants as a reason why the judgment of the trial court should be reversed is that, according to the provisions of the act "only revenue-producing utilities shall be acquired, owned or operated by a district"; whereas the utility sought to be acquired by the plaintiff organization is not revenue producing.
It is urged by appellants that, when the contemplated utility in question has been fully constructed and in operation, water will be brought only to the boundary of the district, and, as the district is not the owner of a distribution system, and as the statute further provides that "each public utility owned and operated by the district shall be self-sustaining," the statutory requirement will not have been complied with, and, consequently, that the utility district is without power to carry out the project or, as incidental thereto, to issue and sell bonds for the purpose of thereby financing the proposition.
The first subdivision of the section of the act here under consideration (sec. 15) provides that "whenever the board of directors by resolution shall determine that the public interest or necessity of the district demands the . . . construction . . . of any public utility," etc., certain steps outlined in the act may be taken to accomplish the desired end; and there are many references contained within the statute showing that the intention of the legislature included the construction of a public utility, rather than limiting the district to the purchase of a completed plant.
In the construction of a new public project, while it may be most earnestly hoped or believed, from a careful survey of the situation, that the operation of the completed plant will result in a net revenue-producing utility, no man with certainty can foresee the result from a standpoint of financial gain. It may be a profit-producing enterprise, or, on *Page 750 
the other hand, there is a possibility of loss arising from its operation. If profitable, the utility will be "self-sustaining"; but, if unprofitable, to the extent that the losses exceed the gains, manifestly it will not meet the literal requirements of the statute. It would be unreasonable to demand that, before the proposition to vote bonds for the purpose of eventually financing the project may be submitted, the promoters thereof, that is to say, the citizens of the district, should guarantee that it will be "revenue producing" in the sense that no loss will accrue to the district. The language of the act should receive a construction to the effect that only such utilities as in theirnature are revenue producing should be acquired by the district, which would, perhaps, exclude such improvements as public parks, libraries, etc. So construed, the project to be constructed would be "self-sustaining," dependent largely upon its management and the support which it received from the owners thereof, to wit, the inhabitants and taxpayers of the district. But, as tending to show that the legislature realized that there was no absolute certainty that the project would be "self-sustaining" the act further provides (sec. 20):
"If from any cause the revenues of the district shall be inadequate to pay the principal or interest on any bonded debt as it becomes due, the board of directors must, or if funds are needed to carry out the objects and purposes of the district, which cannot be provided for out of the revenues of the district, then the board of directors may, levy a tax for such purposes as herein provided. . . ."
The objection that the district has no distribution system, and, consequently, would be unable to sell its product, is met by the reply that, because of the vastness of the proposition, necessarily much time would elapse before the project would be completed, and, before that time will arrive, the district, acting within its powers, may either construct a distribution system within its boundaries, or may acquire one already there constructed, either by lease or by purchase. If an outright purchase, or the construction of a new distribution plant, should be deemed advisable, it is not beyond the realms of possibility that, instead of relying upon a bond issue for the necessary funds with which to make payment therefor, the district might, through the medium of at present unrevealed sources, make compensation *Page 751 
in cash, or possibly finance the proposition by means of assessments levied against the taxpayers of the district. Tested by the rule that every presumption favors the validity of the bond issue, we are constrained to hold that appellants' objection regarding the revenue-producing ability of the utility, together with its asserted nonself-sustaining qualities, cannot be sustained.
Appellants' final assault upon the judgment rendered by the trial court is that, because "no distribution system is provided with this project, or as part of it, its construction cannot benefit the district or the district's inhabitants; and therefore the project is not within or for any of the public purposes of the district."
For the reason that the utility intended to be constructed has no present method of becoming revenue producing from business to be transacted by it within the district, but that necessarily "it will serve only the needs of persons or industries outside the boundaries" thereof, it is urged that the taxpayers within the district cannot be called upon, either by taxes or by assessments upon their property, to meet the obligation incurred for the payment of the project.
The plan proposed to be followed is set forth in a condensed form in the proposition submitted to the electors of the district, to be voted upon at the election to which reference herein has so frequently been had, as follows:
"Shall the East Bay Municipal Utility District incur a bonded debt in the amount of thirty-nine million dollars ($39,000,000) for the construction, completion and acquisition of a source of water supply from the Mokelumne River and other properties and facilities to be used by said district for acquiring and impounding water for said district and conveying the same thereto and for disposing of any surplus waters thereof?"
It thus appears that the purpose was at least to obtain a water supply and facilities to be used by the district "and for disposing of any surplus waters." The evidence shows that the intention was to take the water to the boundaries of the district, and there impound it in a reservoir which is already connected with a distribution system, which now supplies the inhabitants of part of the district. As before stated, under certain sections of the act the plaintiff organization is empowered either to acquire that system by purchase *Page 752 
or by lease, or, it may construct a new distribution system. The consummation of the entire plan of furnishing an adequate supply of water to the district may take a number of years for its accomplishment. Before the system contemplated by the present plan to bring the water to the boundaries of the district may be constructed, the district, by one of the means heretofore suggested, may have acquired a distribution system to connect with the plant already authorized to be constructed. The record herein discloses the fact that proceedings already have been commenced by the district for that very purpose.
The trial court found that, at the inception of the proceedings looking to the construction of the project herein mentioned, the board of directors of the plaintiff organization, at a regular meeting thereof, adopted a resolution by which it was "determined that public interest and necessity demanded the acquisition of a source or sources of water supply for said district and other properties to be used by said district for acquiring and impounding water for said district and for conveying the same thereto."
In the absence of fraud and of any attack upon said finding, it thus appears conclusively and beyond question by the appellants that the district will be benefited by the proposed improvement. (Platt v. City and County of San Francisco, 158 Cal. 74, 93 [110 P. 304]; Pool v. Simmons, 134 Cal. 621, 625 [66 P. 872]; Santa Ana v. Harlin, 99 Cal. 538, 540 [34 P. 224].) Such being the legal status of the question suggested by appellants, it follows that their point is not well taken.
The judgment is affirmed.
Lennon, J., Lawlor, J., Seawell, J., Myers, C.J., Waste, J., and Knight, J., pro tem., concurred.
Rehearing denied. *Page 753