## LUGAR *v.* BURNS.

[No. 24,447. Filed February 24, 1926. Rehearing denied May 14, 1926.]

1. ELECTIONS.—*Contestor has burden of proving that he received more legal votes than contestee.*—A party contesting an election has the burden of proving that he received more legal votes than the contestee. p. 648.

2. ELECTIONS.—*Evidence held insufficient to show that certain voters voted for contestee in election contest.*—Evidence *held* insufficient to show that certain voters voted for the contestee in an election contest. p. 648.

3. APPEAL.—*Appellate tribunal does not weigh conflicting testimony and trial court's decision as to credibility of witnesses is binding on appeal.*—An appellate tribunal does not weigh conflicting testimony, and the decision of the trial court as to the credibility of witnesses is binding on appeal. p. 649.

4. ELECTIONS.—*Evidence held to sustain decision of trial court that certain persons who voted for contestee were legal voters of precincts in which they cast their votes.*—In a proceeding to contest an election, the evidence *held* to sustain the decision of the trial court that certain voters who voted for the contestee were legal voters of the precincts in which they severally cast their votes, and were merely temporarily away from their respective residences while employed elsewhere or while their children were attending a parochial school. p. 649.

5. ELECTIONS.—*Persons leaving their residence temporarily, with no intention of changing their residence, and who do not acquire a residence at place of sojourn, do not lose their right to vote in precinct where they resided before such removal.*— Persons who have acquired a residence in the precinct where they live and who leave their places of residence temporarily to sojourn in another township or county, with no intention of changing their residence, but with a well-defined purpose to claim their domicile in the precinct of their former residence, and who evidence that intent in a lawful manner, and do not acquire a legal residence at the place of their sojourn, do not lose their right to vote in the precinct where they resided before their removal. p. 649.

6. ELECTIONS.—*Whether voters by removal from precinct intended to change their residence was question of fact for trial court, conclusive on appeal if supported by any evidence.*— Whether voters who temporarily removed from their places of residence intended to change their residence and terminate their right to vote in the precinct from which they moved was one of fact for the trial court, and, if supported by any evi-

dence, is conclusive on appeal, whatever evidence there may have been to the contrary.    p. 653.

7.    ELECTIONS.—*In election contest, where contestee had majority of seven votes, proof that six or less number of votes for contestee were illegal would not entitle contestor to office.*— In an election contest, where the contestee had a majority of seven votes, proof that six or any less number of the votes cast for the contestee were illegal would not establish contestor's right to the office.    p. 653.

8.    APPEAL.—*Appellate tribunal will not grant rehearing and dismiss an appeal on the ground that the question involved was rendered moot by acts done after the appeal was taken but not called to court's attention till after appeal was decided.*—An appellate tribunal will not grant a rehearing and dismiss an appeal on the ground that the question involved therein was rendered moot by acts done after the appeal was taken but not called to the court's attention till after the appeal was decided.    p. 654.

From Benton Circuit Court; *George A. Williams,* Special Judge.

Election contest by John M. Lugar against Lawrence W. Burns.    From a judgment for contestee, the contestor appeals.    *Affirmed.*

*George S. Rainey* and *Lesh & Lowther,* for appellant.
*Barce & Barce, McCabe & Sons* and *Hume L. Sammons,* for appellee.

EWBANK, C. J.—Appellant, as contestor, brought this action before the board of commissioners of Benton county, Indiana, to contest the election of appellee as trustee of Bolivar township in said county.    An appeal having been taken to the circuit court, appellee, as contestee, joined issue by an answer of general denial, and by a paragraph of special answer alleging that certain persons who voted for the contestor were not legal voters of the township, and that the contestee received a majority of the legal votes cast.    The trial court made a general finding in favor of the contestee, whereupon the contestor filed his motion for a new trial for the alleged reasons that the finding is not sustained by suf-

ficient evidence, and that it is contrary to law. This motion was overruled and a judgment was rendered to the effect that the contestee was duly elected to the office of township trustee of Bolivar township, and should receive a certificate of election, and that he should recover his costs from the contestor. Overruling the motion for a new trial is assigned as error.

The undisputed evidence showed that 701 votes cast for candidates for the office of township trustee were received and counted, of which 347 votes were counted in favor of the contestor and 354 in favor of the contestee, who was thereupon declared elected. The evidence tending to show that illegal ballots were cast at the election related only to the votes of fifteen persons. Of these, it was admitted that Mary Quinn was not legally entitled to vote, because she was not registered, and that she did vote, and cast her ballot in favor of the contestee. And there was evidence which appellant (the contestor) admits was sufficient to prove that Elmer Waddell was not lawfully entitled to vote, and that he voted for the contestor. Of the other thirteen persons whose right to vote is called in question, it was necessary for the contestor, in order to establish his right to the office of trustee, to prove that at least eight of them had voted without being lawfully entitled to do so, and that eight illegal votes had been cast for the contestee; since the contestor had the burden of proof in this action, and he cannot recover except he has affirmatively established the fact that he received more legal votes than the contestee; not merely that he received as many, the certificate of election being sufficient to support the contestee's right to the office until overcome by evidence that the contestor received more votes than he did. But, two of the thirteen voters, Mrs. Hattie Snapp and Earl Ford, each testified that they voted for the con-

testor, while another, Hilliard F. Stephens, testified that
he belonged to the party represented by the contestor,
but was an "independent voter, though," and the only
other evidence as to whom he voted for was testimony
that his wife was of the other party, and that he and
she were "sore because they did not get schools." And
still another voter, Hazel Cooper, was shown to be the
daughter of a father who belonged to one political party
and a mother who testified that she belonged to the
other, and that she had voted a straight ticket on which
the contestor's name appeared as a candidate. And the
only evidence tending to show for whom Miss Cooper
voted was testimony to the effect that, at the request
of a committeeman of his party, the candidate for as-
sessor on the same ticket with the contestee took her
back to Lafayette, where she worked, after she had
voted, when he drove down there to take a woman of
his own party there, and went after another voter of
that party who was working there. And that man
testified that he understood the women of Miss Cooper's
family (her mother and herself) were of the party to
which the contestor belonged. So that whatever basis
the evidence that she rode back to Lafayette with a
candidate might afford for an inference that Miss
Cooper voted for the contestee, it is not so clear, ex-
plicit, and unequivocal that this court can say, on ap-
peal, that the trial court committed an error in failing
to draw that inference.

There remain only nine voters whose right to cast
ballots is challenged. Of these the evidence showed
that Nicholas Donohue was born in the State of
Indiana, was fifty years of age, and prior to
February 9, 1922, had lived in the east precinct
of Bolivar township about four years; that he had a
house in Otterbein, a small town in that precinct, which
was purchased in 1920, in the name of himself and his

wife, Bridget Donohue; that on February 9, 1922, he
went to work for Samuel Foster who lived about a mile
from Otterbein, being half a mile beyond the township
line, in Warren county; that before moving, he had
rented his house to a tenant from month to month, and,
at the time, told the tenant that he wanted to return;
that at the time of so renting his house, he said to a
druggist in Otterbein and to another person that he
was coming back to vote, and that, at the time he left,
he intended to move back to Otterbein any time that
Foster should no longer want his services; that he had
no understanding with Foster how long he and his wife
should work for him, and Foster paid them by the
month; that at the time when he went there, his wife
also went to work on Foster's farm; that his wife had
lived in Bolivar township all her life (fifty-two years),
and her father resided there; that all her father's peo-
ple attended church at Otterbein, and both Nicholas and
Bridget Donohue continued to get their mail there; that
they left their cookstove and window shades at their
house in Otterbein, and had no property anywhere ex-
cept in Otterbein; and the wife, after testifying to
the same facts, testified that they intended to come back,
that she understood when they moved to Foster's to
work on the farm that they intended to come back to
Otterbein, and said so to her husband; that they had no
home only in Otterbein; that they were just working
for Foster, and nothing was said about how long they
would stay, and that she didn't want to take her win-
dow shades down there, as they would move back, but
left them so they would be there when this was done;
that she did not register in the other county.   And both
Nicholas and Bridget Donohue testified that they reg-
istered in Otterbein, and voted there without challenge
or objection.   As to Matthew and Julia Malady, it was
shown that he was born in Indiana, was forty-three

years old, and was the oldest son of his mother who lived in a house that she owned in Otterbein; that Julia Malady, the wife, was born in Benton county, Indiana; that Malady had lived at his mother's in Otterbein and cultivated a farm north of there, and then he and his wife had both worked for John Murphy, a bachelor, on his farm in the precinct in which they voted in Bolivar township, she doing the housework and her husband the farm work; that they registered in Bolivar township in September, and the next day took their son, eleven years old, to Lafayette to send him to the parochial school; that they left their household goods at "home" at his mother's, cooking utensils, dishes, stoves, beds, all the property they had; that all their household goods were at his mother's, where they had lived for a year before going to work for Murphy. Each of them testified that at the time they went to Lafayette (twelve miles away), and continuously thereafter, it was their intention to return to Otterbein when their son should get through the school; that they always intended to make Otterbein their home, and called it home; that they did not move any furniture to Lafayette, until in December, after the election, but had stayed at the home of a cousin; and then they only moved a little furniture which they thought they needed; and did not take their cookstove because it was too unhandy to be moved back and forth. And as to Earl Ford and Geraldine Ford, his wife, there was evidence that he was born in Templeton, in the precinct in which they voted; that she was born in Kentucky, and removed to Templeton eleven years before the election; that he "made his home" from the time he was two years old until he was twenty-five with "Dick Ford," in Templeton, who was still the janitor of the school building there; that he went into the United States army from Templeton; that they were married there, and both of

their children were born in Templeton; that her mother and two sisters and the family of Dick Ford, with whom the husband had lived from infancy, continued to live there; that on September 18, 1922 (six weeks before the election), both of them went to work for "Joe Mac" on a farm in Warren county, Mac's residence being situated less than three miles from Templeton, but about 500 yards over the line in Warren county; that the wife kept house for Mac for three months, and the husband worked for him on his farm. Both testified that they left with relatives in Templeton some dining room chairs, chicken coops, wire fencing, and a rack for drying clothes; and that when they went to Mac's they intended to come back to Templeton when they "got through down there." And Earl Ford testified that he "had a home to go to if he could not find a house" when ready to come back; that it was at "Dick Ford's home," and that if he couldn't find an empty house, he would "go back home" on leaving Mac's. And both testified that, without objection by anybody, they registered and voted in the precinct in which they had lived in a rented house at Templeton before going to work at Mac's. If Mrs. Hattie Snapp and Earl Ford voted for the contestor, as they testified they did, and Miss Cooper also was of his party, and if Nicholas Donohue, Matthew Malady and their respective wives, and Mrs. Geraldine Ford retained their residences in the precincts where they voted, though temporarily elsewhere, and therefore were entitled to vote at the election, it is not necessary to inquire whether or not the other four ballots in dispute were lawfully cast. Even if all four of them were illegal (as we do not think all of them were), their rejection would not change the result if the others were as has been stated. The direct testimony of two of these parties that they voted for the contestor instead of the contestee, being believed

and acted on by the circuit court, is conclusive on appeal. This court does not weigh conflicting evidence. And the foregoing evidence, including the testimony of the several persons as to their acts and the intent with which those acts were done, sufficiently supports the inference drawn by the circuit court that Nicholas and Bridget Donohue, Matthew and Julia Malady, and Geraldine Ford were all legal voters of the precincts in which they severally cast their ballots, and were only temporarily engaged in working or sending a child to school away from their homes. Persons who have fully acquired a residence for voting purposes in a precinct where they live, and who leave their places of residence temporarily to sojourn in another township or county, with no intention to change their residence, but with the well-defined purpose and intent to claim their domicile in the precinct where they have before resided, and who evidence that intent in a lawful manner, as by declarations of such purpose made at the time of removal, and leaving their household goods in that precinct against the time of their intended return, and by proof of such facts and testimony as to their intention satisfy the trial court that they did not leave the precinct with an intent to give up their residence therein and acquire a residence somewhere else, do not lose their right to vote in the precinct where they resided before such removal. *State, ex rel.,* v. *Scott* (1908), 171 Ind. 349, 358, 359, 86 N. E. 409, and authorities there cited.

The question whether or not the removal was accompanied by such an intention to change their residence as terminated such residence and their right to 6, 7. vote in the precinct from which they removed is one of fact, as to which the finding of the trial court is conclusive, if supported by any evidence at all, whatever other evidence there may be to the contrary.

*Glick* v. *Hunter* (1920), 190 Ind. 51, 53, 54, 129 N. E. 232; *State, ex rel.,* v. *Scott, supra.* On the face of the returns, the contestee had a majority of seven votes, 354 having been counted for him and 347 for the contestor. And mere proof that a half dozen, or less, of the votes cast for and counted in favor of the contestee were illegal, would not establish his adversary's right to the office of trustee. Therefore, we shall not prolong this opinion by making an analysis of the evidence concerning the right of Charles H. Neal, Arthur Snapp, Jerry Snapp and Lydia Stephens to vote in Bolivar township at this election. There is evidence sufficient to sustain the finding.

The judgment is affirmed.

## ON PETITION FOR REHEARING.

EWBANK, C. J.—Appellant has filed a verified petition asking the court to grant a rehearing and dismiss this appeal, as involving only a moot question, 8. because of certain facts recited in the petition which are not shown by the record. This appeal was taken by appellant in September, 1923, and at any and all times up to February 24, 1926, when the cause was decided, he might have had his appeal dismissed by filing a motion to that effect. But it was not until April 6, 1926, that he asked for its dismissal, and not until then had he undertaken to show to the Supreme Court any of the facts because of which he now insists it ought to have been dismissed. Those facts, as stated in his verified petition, are that on August 24, 1925, six months before this court affirmed the judgment, appellant resigned as trustee of Bolivar township, Benton county, Indiana, and two days later, appellee was appointed and filed his bond as township trustee, which recited that appellant had resigned and he had been duly appointed by the county auditor as such township

trustee to serve until his successor shall have been duly elected and qualified, and that thereupon appellee took possession of said office and ever since has continued to fill it. If appellant believed that these facts terminated the controversy and subjected his appeal to dismissal, he might have asked for its dismissal at any time in the six months which elapsed between the time when he resigned and the time when the Supreme Court announced its decision. But the rule is firmly established that the Supreme Court will not grant a rehearing to decide a question that was not presented by the record on which that decision was based, nor in any way suggested to the court until after the decision was made. Rule 22, Supreme Court; *Meek* v. *State, ex rel.* (1909), 172 Ind. 654, 663, 88 N. E. 299, 89 N. E. 307; *Baltimore, etc., R. Co.* v. *Sliger* (1923), 194 Ind. 442, 450, 141 N. E. 467, 143 N. E. 282. No question was before the Supreme Court as to the effect which the resignation by appellant and the appointment and qualification of appellee as trustee may have had on the rights of the parties as previously determined by the judgment which was affirmed, and our decision does not declare the effect which anything that occurred after the appeal was taken may have had upon those rights. The action of the Supreme Court was confined to determining that the trial court did not err in its decision made and judgment rendered in June, 1923. We cannot now recall that decision to pass upon questions arising out of acts done in 1925, as to which nothing was shown by the record or in any manner whatever presented to this court for consideration at the time it decided the appeal.

The petition for a rehearing is overruled.