[S.F. No. 22724. In Bank. Sept. 17, 1970.]

JESUS CANALES et al., Plaintiffs and Appellants, v.
CITY OF ALVISO, Defendant and Respondent;
CITY OF SAN JOSE, Intervener and Respondent.

## COUNSEL

Ephraim Margolin and Henry C. Krivetsky for Plaintiffs and Appellants.

Neil Horton, Paul N. Halvonik, Stephen Manley and Grace M. Kubota as Amici Curiae on behalf of Plaintiffs and Appellants.

Ferdinand P. Palla, City Attorney, Richard K. Karren, Assistant City Attorney, and Donald C. Atkinson, Deputy City Attorney, for Defendant and Respondent.

Johnston & Miller and Faber L. Johnston, Jr., for Intervener and Respondent.

## OPINION

**PETERS, J.**—Petitioners brought an action to contest an election held in the City of Alviso in January of 1968 to determine whether that city should consolidate with the City of San Jose. The petitioners alleged that they were electors of Alviso, that consolidation carried only because of illegal votes, that respondents offered valuable consideration to induce Alvisans to vote in favor of consolidation, and that the election board responsible for the conduct of the election committed various acts of misconduct. (Elec. Code, § 20021.)

After a recount of ballots (*id.*, § 20084), the tally was left at 189 votes in favor of and 180 votes opposed to consolidation, and petitioners introduced evidence to support their allegations. Some 21 challenged voters testified as to their residence prior to the election. (Cal. Const., art. II, § 1; Elec. Code, § 20.) Ten were shown to be disqualified by nonresidence; an eleventh was stipulated to be disqualified by a felony conviction. It was stipulated that the felon voted in favor of consolidation, and one witness, whose testimony clearly revealed his disqualification, said he voted against. The trial court sustained respondents' objections to questions posed by petitioners as to how other witnesses voted. The petitioners introduced into evidence petitions, signed by the remaining illegal voters, which called for putting the consolidation issue to the electors of Alviso.

To support the allegation of illegal offers of consideration, the petitioners introduced evidence which tended to show that the City of San Jose promised Alvisans a community center, a swimming pool, street lights, storm drains, and street improvements—in addition to typical local

government services—if consolidation carried. These promises were evidenced by a contract between San Jose and the Alviso Improvement Corporation, an organization which was formed in close cooperation with the San Jose City Manager's office to campaign for consolidation in Alviso. The contract became a substantial part of the proponents' election literature.

The San Jose City Manager, his administrative assistant, and the Mayor of San Jose took part in the campaign by speaking at meetings attended by varying numbers of Alviso electors to explain the promises embodied in the contract. The city manager wrote letters to 6 or 8 of Alviso's 12 to 15 paid employees, giving his "personal guarantee the City of San Jose will hire you as a Civil Service employee in the same type of work [in which] you are now engaged without the loss of a single day's wages." The city manager and his assistant also promised to use their power to effectuate a San Jose City Council resolution calling for "great caution" and avoidance of "unnecessary hardships" in the enforcement of San Jose's building code in Alviso.

The city manager's administrative assistant informed the Alviso Fire Chief that six to eight of Alviso's unpaid firemen would receive jobs on the San Jose Fire Department if consolidation carried, without having to pass civil service examinations. Fire Chief Perkins relayed this information to the 10 or 11 volunteer firemen who attended a meeting called by him for that purpose, along with the administrative assistant's warning —never denied by him—that any fireman who was outspoken against consolidation would have "very little chance of getting a job." One Alviso resident testified that he was offered $100 to work for consolidation by the San Jose City Manager's administrative assistant and one Tony Santos, an Alviso City Councilman. Another resident's testimony that he was in essence offered a job with the City of San Jose if he would work for consolidation was not contradicted. The administrative assistant denied making the $100 offer or ever offering anyone a job conditioned upon a favorable vote on the consolidation issue.

The petitioners' evidence of purported misconduct on the part of the election board included testimony that two voters were denied ballots when they admitted moving prior to the election, only to be given ballots when they returned accompanied by Councilman Santos, who demanded that they be allowed to vote because they owned property in Alviso. Six voters were given ballots in spite of admissions that they did not live in Alviso. Three voters were given ballots in spite of the election board judge's personal knowledge that they did not reside in Alviso. All of these voters were listed on petitioner's challenge list, two copies of which were

presented to the election board inspector. None of these voters was required to take the statutory residence oath (Elec. Code, § 14244.5) prior to voting. In addition, the evidence tended to show that the board took no action against two proponents of consolidation, Councilman Santos and the president of the Alviso Improvement Corporation, who talked to voters at the polls, and apparently caused some disruption. There was no evidence that they prevented anyone from voting. Finally, there was testimony that a truck carrying a sign urging consolidation parked near the steps to the polls.

The trial court granted respondents' motion "in the nature of a motion for nonsuit" as to the illegal vote contention. (Code Civ. Proc., § 631.8.) The court found that of the 21 challenged voters, 10 were disqualified by nonresidence in Alviso and one by virtue of a felony conviction; that of these 11 illegal votes, one was cast for and one against consolidation; "that it cannot be ascertained and there was no evidence how the remaining 9 illegal ballots were cast"; and that the remaining 9 votes should be taken half from each side—leaving a final tally of 183½ votes in favor and 174½ votes opposed to consolidation. Although the court held that board misconduct or offers of consideration may void an election, it found that neither respondents nor their agents made any offer of valuable consideration to induce electors to vote in favor of consolidation, and that the election board was not guilty of any misconduct.

The findings—prepared by respondents—also held the allegations of paragraph I of petitioners' statement of contest "not true" except as to the identity of petitioners. Paragraph I alleged that petitioners "during all of the times herein mentioned were, and still are, electors of the City of Alviso." Petitioners' objections to respondents' proposed findings expressly requested that the allegations of paragraph I be found true.

Judgment confirming the election was entered April 8, 1968.

## STANDING

Initially we must deal with respondents' contention that petitioners, having been found not to be electors by the trial court, have no standing to contest the election.

Elections Code section 20021 provides in relevant part that "[a]ny *elector* of a county, city, or of any political subdivision of either may contest any election held therein, . . ." (Italics added.)

■ The trial court's finding that petitioners were not electors of Alviso cannot be upheld. Petitioners expressly averred in their second amended statement of contest that they "during all of the times herein mentioned

were, and still are, electors of the City of Alviso." Petitioners offered in evidence the precinct index containing their names as electors, but this proof—albeit inconclusive—of petitioners' status as qualified electors was kept out of evidence by respondents' insistence upon materiality to issues at trial. Had respondents ever denied the averment that petitioners were electors, this evidence would have been both material and admissible. But respondents never filed an answer to the statement of contest, and never disputed the averment in their several motions to dismiss at trial. Accordingly, respondents must be deemed to have admitted petitioners' status as electors. (*Doty* v. *Jenkins,* 142 Cal. 497, 499 [77 P. 1104].) Respondents may not raise the issue for the first time in findings of fact prepared for the trial court.

### ILLEGAL VOTES

■ Review of judgments entered with findings of fact on a motion for judgment under Code of Civil Procedure section 631.8 is governed by the same rules which apply on appeal following any other findings. (*U. S. Industries, Inc.* v. *Vadnais,* 270 Cal.App.2d 520, 524 [76 Cal.Rptr. 44].)

■ Under section 20024 of the Elections Code, the contestants must make it appear not only that illegal votes were sufficient in number to account for the result but also that illegal votes were cast in such a manner as in fact to determine the result. ■ We are satisfied that contestants met their burden as to the crucial nine votes and that in the absence of any contrary evidence, the trial court erred in refusing to so find.

The only evidence in the record as to how the nine illegal votes were cast is the signatures of all nine voters on the petition by virtue of which the election was held. Although circumstantial, such evidence is admissible. (*Robinson* v. *McAbee,* 64 Cal.App. 709, 718 [222 P. 871].) ■ Respondents made no effort to show that these votes were cast inconsistently with the wording of the petition, which asked "that the City of Alviso be consolidated with the City of San Jose . . . that [the Alviso City Council] call a special election without delay and submit the question of such consolidation to the electors of the City of Alviso, and that [the city council] do all other things within [its] power necessary to consolidate the City of Alviso with the City of San Jose. . . ." Accordingly, the record leads reasonably only to the conclusion that all nine illegal votes were cast in favor of consolidation.

In defending the trial court's allocation of the nine votes, respondents invoke the policy in favor of upholding elections (*Simpson* v. *City of Los Angeles,* 40 Cal.2d 271, 277 [253 P.2d 464]; *Davis* v. *County of Los Angeles,* 12 Cal.2d 412, 426-427 [84 P.2d 1034]; *Rideout* v. *City of Los Angeles,* 185 Cal. 426, 430 [197 P. 74]; *People* v. *Prewett,* 124 Cal. 7,

10 [56 P. 619]), and argue that the fact illegal voters signed the petition for consolidation is insufficient proof of how they voted—at least in view of other methods of proof allegedly open to petitioners. We have concluded that the trial court's disposition of the illegal vote contention cannot be upheld on either of these grounds.

The policy in favor of upholding elections appears in the cases in conjunction with the rule that "[t]echnical errors or irregularities arising in carrying out directory provisions *which do not affect the result* will not avoid the election." (*Davis* v. *County of Los Angeles, supra,* 12 Cal.2d at p. 426 (italics added); *Rideout* v. *City of Los Angeles, supra,* 185 Cal. at p. 430; *People* v. *Prewett, supra,* 124 Cal. at p. 10.) ▪ Both the policy and the rule manifest the fact that "[c]ourts are reluctant to defeat the fair expression of popular will in elections. . . ." (*Simpson* v. *City of Los Angeles, supra,* 40 Cal.2d at p. 277); neither has been invoked to uphold an election in the face of illegalities which affected the result—a situation in which the will of the people may be thwarted by upholding an election. Hence, respondents' invocation of the policy in favor of upholding elections begs the question whether irregularities were merely incidental to the result or in fact prevented "the fair expression of popular will."

On the merits, respondents contend that the signatures of illegal voters on the petition[1] does not prove that they voted in favor of consolidation some three months later, and that petitioners should have asked directly how each witness voted. On this theory, respondents conclude that there was no substantial evidence tending to show how illegal votes were cast, and hence that the trial court was correct in dividing the illegal votes equally under the rule of *Russell* v. *McDowell,* 83 Cal. 70, 72-74 [23 P. 183], as applied in *Singletary* v. *Kelley,* 242 Cal.App.2d 611, 612 [51 Cal.Rptr. 682]. Those cases clearly call for a division of illegal votes in proportion to legal votes *when there is no evidence of how those votes were cast.*[2] There can be no doubt,

---

[1]Five of the nine illegal voters whose signatures appear on the petition testified that they signed it. Of the remaining four, two testified that they were in favor of consolidation, and one—whose parents were also illegal voters, and testified that they signed the petition at the same time they were registered by two prominent proponents of consolidation—testified that he was registered by those proponents. His signature appears immediately after those of his parents. Evidence of the signature of the remaining illegal voter comes solely from the petition itself, although he testified that the Taylor Street address he gave the registrar (and which appears on the petition) was in fact the address of a "beer hall" he rented from Councilman Santos. Respondents complain that they would have demanded authentication of the signature on the petition had they understood that the petition was offered to prove how illegal voters voted. From the record, however, there can be no doubt that all parties understood that the petition was offered and received primarily for this purpose.

[2]Respondents contend that the record in *Singletary* in fact contained evidence as probative of how illegal votes were cast as is the evidence in the instant case, and hence that *Singletary* stands for the proposition that such evidence is insufficient. But

however, that a voter's signature on a petition urging that an issue be put on the ballot so that a certain result may be obtained is circumstantial evidence which is admissible to show that he in fact voted in favor of that result. (*Robinson* v. *McAbee, supra,* 64 Cal.App. at p. 718.) Accordingly, the *Russell* rule is of no avail to respondents. (Cf. *Garrison* v. *Rourke,* 32 Cal.2d 430, 441 [196 P.2d 884].)

Contestants are not required to ask voters how they voted. If petitioners made a tactical decision based upon fears either that a witness changed his mind after signing the petition or that a strong proponent of consolidation who voted illegally would lie to preserve the result of the election, such a decision would not relieve respondents of their obligation to counter the substantial evidence in fact introduced by petitioners to show that the nine illegal votes were cast in favor of consolidation.[3] Respondents had the same problematical opportunity to ask voters how they voted, but did not cross-examine the witnesses who testified that they signed the petition or favored consolidation to attempt to rebut petitioners' circumstantial showing that the witnesses voted in accord with their signatures on the petition.[4]

Although an elector who signed the petition may subsequently have changed his mind, respondents made no effort to show that this ever occurred in fact. As a result the record clearly contains substantial evidence tending to show that all nine illegal votes were cast in favor of consolidation, and absolutely no evidence to the contrary. Accordingly, this judgment must be reversed for lack of any evidentiary support. (*Haines* v. *Bechdolt,* 231 Cal.App.2d 659, 665 [42 Cal.Rptr. 53].)

Since settled rules of review require reversal here, it is unnecessary to

the facts as set forth by the court do not include any such evidence. "It is axiomatic that cases are not authority for propositions not considered." (*People* v. *Gilbert,* 1 Cal.3d 475, 482, fn. 7 [82 Cal.Rptr. 724, 462 P.2d 580].) "Questions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents." (*Webster* v. *Fall* (1925) 266 U.S. 507, 511 [69 L.Ed. 411, 413, 45 S.Ct. 148].)

[3]Petitioners do not dispute the finding that only nine votes were illegal in addition to those two which were clearly accounted for. Of course, both sides are free to relitigate the validity of any challenged vote upon retrial. (E.g., *Atchison etc. Ry. Co.* v. *Superior Court,* 12 Cal.2d 549, 554 [86 P.2d 85].)

[4]For purposes of retrial, it would seem that the problem can be handled by a pretrial order establishing a procedure by which the court rules on the legality of a vote after a full opportunity for both sides to present evidence, and then permits illegal voters to be asked how they voted. Where it appears that the only evidence will come from the witness himself and previously submitted exhibits, a trial judge might rule on the legality of each vote after cross-examination or a *voir dire* of the witness, and permit an illegal voter to answer how he cast his ballot on redirect or after the *voir dire.* If the legality of each vote must be determined from the testimony of more than one witness, the witnesses can be excused subject to being recalled after the trial court has made a ruling as to the legality of each vote based upon all the evidence. (Cf. Evid. Code, § 320.)

pass on the suggestion of amicus American Civil Liberties Union of Northern California that because of the fundamental nature of the rights at stake (*Otsuka* v. *Hite,* 64 Cal.2d 596, 601 [51 Cal.Rptr. 284, 414 P.2d 412], and cases cited), appellate courts must undertake an independent review of the evidence (cf., e.g., *Los Angeles Teachers Union* v. *Los Angeles Board of Education,* 71 Cal.2d 551, 556 [78 Cal.Rptr. 723, 455 P.2d 827]) and void elections whenever the evidence reveals a "reasonable likelihood" that the contestants' votes have been unconstitutionally diluted and the result of the election has thereby been determined (cf. *Maine* v. *Superior Court,* 68 Cal.2d 375, 383-384 [66 Cal.Rptr. 724, 438 P.2d 372]).

Since questions involving alleged illegal job offers and board misconduct may arise on retrial, we proceed to consider those issues.

### Offers of Consideration

Petitioners' contention that the election must be voided because of offers of consideration is based upon Elections Code section 20021, subdivision (c), which permits contests when "the defendant has given to any elector . . . any bribe or reward, or has offered any bribe or reward for the purpose of procuring his election, or has committed any other offense against the elective franchise defined in Chapter 3 (commencing at Section 12000) of Division 8 or Division 15, of this code." In relevant part, the penal provisions referred to in section 20021 proscribe bribery for the purpose of influencing any voter in casting his vote (Elec. Code, §§ 29130, 12003), offers of employment designed to induce a voter to vote or refrain from voting (*id.,* § 12004), and the making of "any gift, loan, promise, offer, procurement, or agreement to, for, or with any person, in order to induce that person to procure or endeavor to procure the . . . vote of any voter at any election." (*Id.,* § 12005.)

Respondents' contention that offers of consideration cannot be the ground of an election contest must be rejected. ■ Section 20021 permits an elector to challenge "any election" held in his political subdivision "for any of the [enumerated] causes." And, although some of the language of subdivision (c) implies a candidate election ("his election"), section 20089 provides that this and certain other provisions of the code "shall also apply to the recount of votes cast on a ballot measure, insofar as they can be made applicable." It is clear that a "recount of votes cast" is not limited to the mechanical process of counting ballots, but embraces at least the adjudication of whether a vote is illegal by reason of the nonresidence of the voter. (*Singletary* v. *Kelley, supra,* 242 Cal.App.2d 611.)

■ Thus subdivision (d) of section 20021, which permits contests

based on "illegal votes," can be the basis of a ballot measure election contest, and no reason appears why subdivision (c) should not also apply to such elections. ▇ A contestant must establish that the outcome of the election was determined by virtue of the defect of which he complains if the contest is based upon illegal votes. (Elec. Code, § 20024.) No such statutory requirement exists when a candidate election is contested on the basis of that candidate's offer of bribes to secure his election. Whatever should be the result when a *candidate* commits such acts,[5] a ballot measure is not rendered unworthy of passage by the misdeeds of its proponents. ▇ Illegal offers of consideration should not void an election unless it is shown that the result would have been different without their influence—i.e., if they prevented the expression of the majority will. By requiring a contestant of a ballot measure election who relies upon subdivision (c) to show that a defendant who offered valuable consideration thereby affected the outcome of the election,[6] subdivision (c) "can be made applicable" to "the recount of votes cast on a ballot measure," as can subdivision (d), within the meaning of section 20089. (Cf. *Williams* v. *Venneman,* 42 Cal.App.2d 618, 620-621 [109 P.2d 757].)

Moreover, it is settled that "a qualified voter has a constitutional right to vote in elections without having his vote wrongfully denied, debased or diluted. . . ." (*Hadley* v. *Junior College Dist.* (1970) 397 U.S. 50, 52 [25 L.Ed.2d 45, 49, 90 S.Ct. 791], and cases cited), that ballot box stuffing may deprive a voter of this fundamental right (*Reynolds* v. *Sims* (1964) 377 U.S. 533, 554-555 [12 L.Ed.2d 506, 522-523, 84 S.Ct. 1362]; *Baker* v. *Carr* (1962) 369 U.S. 186, 208 [7 L.Ed.2d 663, 680, 82 S.Ct. 691]),

---

[5]Perhaps the absence of a statutory requirement of a showing that bribery affected the result is explained by the fact that a candidate who is *convicted* of bribery is thereby rendered ineligible for office. (Cal. Const., art. XX, § 10.) We need not now decide whether a showing by a preponderance of evidence that a candidate is responsible for misdeeds specified in section 20021, subdivision (c), is sufficient to invalidate an election absent both a conviction and a demonstration that the misdeeds determined the result of the election. (Cf. *Miller* v. *Childs,* 28 Cal.App. 478, 483-484 [152 P. 972].)

[6]Amici League of Women Voters of California and the Committee for Fair Elections argue that requiring a contestant to show that illegal offers of consideration affected the result poses an unfortunate burden in view of the overriding interest in the "purity of the ballot." Their authorities (*Carrothers* v. *Russell* (1880) 53 Iowa 346 [5 N.W. 499]; *Cook* v. *Corbett* (Ore. 1968) 446 P.2d 179) and their logic —"The beneficiary of the corrupt practice should suffer the consequences, not the electorate"—apply only to candidate elections, and then only when the candidate has authorized the misconduct (*Miller* v. *Childs, supra,* 28 Cal.App. at pp. 483-484). Unless we require that a ballot measure election contestant demonstrate that offers of consideration probably affected the result, we can conceive of no way to ensure that voiding an election does not penalize the electorate as well as the guilty proponent, or to prevent the voiding of elections for corrupt practices secretly *intended* merely to provide grounds for voiding the election.

and that these principles apply with full force to exercises of state power through political subdivisions such as cities (*Avery* v. *Midland County* (1968) 390 U.S. 474, 481 [20 L.Ed.2d 45, 51, 88 S.Ct. 1114]). There is no logical basis on which to distinguish issue elections from candidate elections in regard to the right to an equal vote (cf. *Cipriano* v. *City of Houma* (1969) 395 U.S. 701 [23 L.Ed.2d 647, 89 S.Ct. 1897]), and it would appear that a citizen's vote may be as unconstitutionally debased by inducing votes with bribes as by stuffing ballot boxes with illegal votes. If the result of an election is determined by either of these unlawful means, it is self-evident that at least those who voted for the losing side have been deprived of their constitutional right to an equal vote. ▮ Accordingly, construing section 20021 to permit ballot measure election contests grounded on bribes designed to influence voting is essential if the judiciary is to remain available for the vindication of the fundamental rights at stake here.

▮ A countervailing limitation to the grounds upon which any election—candidate or issue—may be challenged is that fundamental First Amendment interests in full and free discussion may take precedence whenever they conflict with provisions of the Elections Code. Election-oriented debates are, of course, designed to influence voting, and a campaign speech generally promising an increase in the number of government jobs arguably conflicts with provisions proscribing offering employment to influence voters. But First Amendment interests undoubtedly immunize election speeches which fall short of promises of employment conditioned on a certain vote. (Cf., e.g., *Fort* v. *Civil Service Commission*, 61 Cal.2d 331 [38 Cal.Rptr. 625, 392 P.2d 385].)

Viewed in this light, most of petitioners' objections to San Jose's promises must be rejected. Petitioners do not contend that the participation of San Jose city officials in a consolidation campaign in which that city is interested is per se improper, and city officials and other proponents must be able to argue the merits of consolidation. ▮ Accordingly, the fact that San Jose promised recreational and other municipal improvements, and "great caution" in the enforcement of its building code, cannot affect the validity of the election, as purported advantages of consolidation such as these went to the heart of any meaningful debate on this issue.

▮ Likewise, the fate of employees of a consolidated city is certainly of interest to those employees, and the fact that the consolidating city's officials took steps to minimize losses of employment, and to communicate their view of the relevant considerations, does not affect the validity of the election—at least where, as in this case, it is not shown that job guarantees were conditioned upon the employee's favorable vote. ▮ Article XI, section 1106 of the San Jose City Charter provides that employees of con-

solidated cities shall "be deemed to have their names upon eligible lists for respective types of positions held by them, and to be qualified for appointment to such respective positions." The San Jose City Manager's letters, giving his personal assurance that the recipient employees of Alviso would in fact be hired if consolidation carried, went beyond the charter provision only to the extent of indicating, in essence, that all eligible applicants would find openings. A competent estimate of the practical effect of the charter provision, in light of San Jose's employment situation, would clearly be of interest to Alviso employees, and there is no impropriety in furnishing that estimate to the interested persons.

It would be shirking reality to deny that the San Jose City Manager, who clearly favored consolidation, hoped that ensuring employment for Alviso's city employees would further the chances of consolidation at the polls, or that this hope was at least one motivating factor behind his letters and appearances. Such offers might be deemed improper in a candidate election (*Bush* v. *Head,* 154 Cal. 277, 283 [97 P. 512]), but the balance between First Amendment interests in full discussion and Fourteenth Amendment interests in equal voting rights demands a different result here. Whatever the appropriate result when, for example, a candidate promises to retain his predecessor's staff if elected, the fate of employees of a consolidated city is too close to the merits of the issue before the electors to permit chilling relevant discussion by voiding elections because of that discussion—especially when the purity of the promisor's motives is at most indirectly relevant to the merits of the measure voted upon. Moreover, petitioners presented no evidence that any of the six or eight employees who received the city manager's letters—or anyone else—was influenced thereby, and this ground of contest must therefore fail for lack of a showing that job offers affected the result of the election.

The promises of jobs to volunteer firemen was apparently a matter of some controversy within the San Jose City Council, but a majority of that body determined in good faith that the charter provision should be applicable to unpaid firemen who are interested in paying positions upon consolidation. ■ On the other hand, conditioning eligibility upon not being outspoken in opposition to consolidation is clearly improper. (E.g., *Fort* v. *Civil Service Commission, supra,* 61 Cal.2d 331.) Petitioners made no showing, however, that any of the volunteer firemen who heard this condition were thereby deterred from opposing consolidation, or that this impropriety contributed in any way to the result of the election.

■ Finally, the testimony of one Alviso resident that he was offered

$100 to "get the people together" and "push for consolidation" was directly contradicted by the purported offeror, the administrative assistant to the San Jose City Manager, and the trial court's finding that no agent of San Jose offered valuable consideration "to induce . . . any other person to procure or endeavor to procure a favorable vote on consolidation" must be deemed conclusive on this point. Dr. Galarza's testimony that the administrative assistant asked him to encourage Alvisan Mexican-Americans to vote for consolidation, and at the same time asked him if he would be interested in a job with the City of San Jose, was uncontradicted. We need not decide, however, whether this constituted as a matter of law an illegal attempt to induce Dr. Galarza to endeavor to procure a favorable vote (Elec. Code, § 12005; cf. *Bush* v. *Head, supra,* 154 Cal. at p. 283; *Bradley* v. *Clark,* 133 Cal. 196, 203-208 [65 P. 395]), as no alleged offer was accepted, and petitioners made no showing that any such offer contributed to the result of the election.

## Election Board Misconduct

For all the reasons ballot measure election contests must be permitted under subdivision (c) of section 20021 when it is alleged that the result was determined by illegal offers of consideration—as discussed in the previous section—contests must be permitted under subdivision (a) on grounds "[t]hat the precinct board or any member thereof was guilty of malconduct. . . ."[7] By statute, it must be shown that misconduct affected the result. (Elec. Code, §§ 20022, 20023.)

On the merits, it was clearly improper for election officials to permit the challenged voters to vote without administering the oath of residence required whenever a voter is challenged on the basis of nonresidence. (Elec. Code, § 14244.5.)     Similarly, it would have been preferable had the officials cleared the polls of persons who were not present for lawful purposes. There is no evidence, however, that the presence of the truck carrying a sign urging consolidation was brought to the attention of the board. Since there was evidence that congestion at the polls did not prevent anyone from voting, and since petitioners showed only that at most eight votes (including five of the illegal votes) were cast by virtue of misconduct, there was no evidence that consolidation would have been defeated but for

---

[7]Subdivision (e) of section 20021 should also apply to ballot measure election contests, although it is not now involved in this case. It provides that a contest may be based on the ground "[t]hat the precinct board in conducting the election or in canvassing the returns, made errors sufficient to change the result of the election as to any person who has been declared elected."

the misconduct alleged, and the trial court properly declined to void the election on this ground. (Elec. Code, §§ 20022, 20023.)

The judgment is reversed.

Tobriner, J., Mosk, J., and Sullivan, J., concurred.

**BURKE, J.**—I dissent. Contestants had the burden of establishing by clear and convincing evidence that each of the nine *illegal* voters in question actually voted in favor of consolidation. Although direct evidence on this issue was readily available to contestants by asking each voter how he voted, nevertheless contestants chose to rely exclusively upon "circumstantial evidence" consisting of a petition signed by these voters several months prior to the election. Since this evidence was not clear and convincing, but instead was conjectural and speculative on the issue sought to be proved, the trial court was clearly justified in finding against contestants. Having so found, this court should refrain from substituting its judgment for that of the trial court.

"It is the primary principle of law as applied to election contests that it is the duty of the court to validate the election if possible. That is to say, the election must be held valid *unless plainly illegal.* [Citations.]" (Italics added; *Rideout* v. *City of Los Angeles,* 185 Cal. 426, 430 [197 P. 74]; see *In re East Bay etc. Water Bonds of 1925,* 196 Cal. 725, 744 [239 P. 38]; *People* v. *Prewett,* 124 Cal. 7, 10 [56 P. 619]; *Shinn* v. *Heusner,* 91 Cal. App.2d 248, 252 [204 P.2d 886].)

Accordingly, the rule has developed that a contestant has the burden of proving not only that illegal votes were cast, but that they were cast for the contestee. (*Russell* v. *McDowell,* 83 Cal. 70, 73 [23 P. 183]; *Singletary* v. *Kelley,* 242 Cal.App.2d 611 [51 Cal.Rptr. 682]; Elec. Code, § 20024.) In a noncandidate election, such as involved herein, contestants must establish in what manner the illegal votes were cast for the ballot issue involved. (*Singletary* v. *Kelley, supra.*) The courts have required contestants to furnish "very clear" evidence (*Smith* v. *Thomas,* 121 Cal. 533, 536 [54 P. 71]), or "clear and convincing" evidence (*Hawkins* v. *Sanguinetti,* 98 Cal.App.2d 278, 283 [220 P.2d 58]) in this regard, and have uniformly insisted that such evidence be adduced from the illegal voter himself, if he is available and willing to testify. (*Smith* v. *Thomas, supra; Lauer* v. *Estes,* 120 Cal. 652, 656 [53 P. 262]; *Russell* v. *McDowell, supra; Hawkins* v. *Sanguinetti, supra; Robinson* v. *McAbee,* 64 Cal.App. 709, 715 [222 P. 871].)

For example, the *Lauer* and *Hawkins* cases, *supra,* rejected the use of extrajudicial writings purporting to disclose how particular illegal voters voted. In *Smith, supra,* the court stated that "very clear evidence should be

furnished as to how one did vote before his vote can be deducted from the total of any candidate," thereby rejecting voter Crabree's statement that "if I had voted, I suppose I would have voted for [defendant]." (121 Cal. at p. 535.) In *Russell, supra,* the court affirmed that "there is but one means of proving how the illegal voter has cast his vote; that is to say, by his own testimony. . . ." Cases from other jurisdictions have adopted this rule.[1]

With the rule so well established by the foregoing cases, I am frankly astounded that the majority can conclude that "Contestants are not required to ask voters how they voted." (*Ante,* p. 128.) The majority rely exclusively upon *Robinson* v. *McAbee, supra,* 64 Cal.App. 709, to support their theory that the consolidation petition was sufficient circumstantial evidence to disclose how the illegal voters voted. But *Robinson* held that "The court did not err in requiring the witness, Miss Waggoner, an alleged illegal voter, to give testimony disclosing the name of the person for whom she voted for the office of justice of the peace." (64 Cal.App. at p. 713.) True, *Robinson* also noted that "circumstantial evidence may be resorted to, *if necessary,* to prove that a disqualified voter has cast his ballot or voted for a particular candidate at a particular election" (italics added, 64 Cal.App. at p. 718), citing McCrary on Elections. McCrary states that "where a voter refuses to disclose, or fails to remember, for whom he voted, it is competent to resort to circumstantial evidence, to raise a presumption in regard to that fact. (McCrary, Elections, § 493, at p. 363.) In other words, circumstantial evidence is admissible only where direct evidence is unavailable from the voter himself. In *Robinson,* the illegal voter *was* examined, but couldn't "swear" that she actually voted for contestee. Therefore, circumstantial evidence of her intentions was admissible.

Reliance upon *Robinson* to support a broader rule was expressly rejected in *Hawkins* v. *Sanguinetti, supra,* 98 Cal.App.2d 278, 283-284, wherein contestants sought to introduce affidavits of voters executed one month following the election. The court relied upon *Lauer* v. *Estes, supra,* 120 Cal. 652, as controlling, and stated that *Robinson* "is not, as appellant contends, authority for the use of writings in a manner such as is proposed by appellant herein."

Surely, a petition signed months before the election occurred is entitled to no greater weight or effect than the affidavit of a voter executed shortly thereafter, and does not constitute the "very clear" evidence required by the cases. As the trial court herein stated upon admitting the petition into evidence, "the court will indicate at this time that it feels it [the petition] has

---

[1]See, e.g., *Wilkinson* v. *McGill,* 192 Md. 387 [64 A.2d 266, 274]; *Bentley* v. *Wright,* 303 Ky. 618 [197 S.W.2d 420, 422]; *Lugar* v. *Burns,* 197 Ind. 646 [150 N.E. 774, 775]; *Ganske* v. *Independent School Dist. No. 84,* 271 Minn. 531 [136 N.W.2d 405, 408]; *Application of Murphy,* 101 N.J.Super. 163 [243 A.2d 832, 836].

very little probative value, if any, at all with respect to how a person voted because certainly anyone can sign a petition denoting their desire to have an issue put before the people for election, but it doesn't indicate how they're going to vote in any sense. It will be primarily admitted for the purposes of what value they [*sic*] may have for impeachment purposes."

Evidence Code section 412 provides that "If weaker and less satisfactory evidence is offered when it was within the power of the party to produce stronger and more satisfactory evidence, the evidence offered should be viewed with distrust." Evidence Code section 413 states that "In determining what inferences to draw from the evidence or facts in the case against a party, the trier of fact may consider, among other things, the party's . . . wilful suppression of evidence relating thereto . . . ." As stated in *Shapiro* v. *Equitable Life Assur. Soc.,* 76 Cal.App.2d 75, 94 [172 P.2d 725], quoting from Wigmore, " 'The nonproduction of evidence that would naturally have been produced by an honest and therefore fearless claimant permits the inference that its *tenor is unfavorable to the party's cause.*' (Italics in the text.)" (See also Witkin, Evidence (2d ed. 1966) §§ 1127-1130, and cases cited.)

The foregoing authorities are directly on point and sustain the trial court's finding herein that contestants failed to prove that the nine illegal voters in question actually voted for consolidation. The majority attempt to excuse contestants from their failure to examine the illegal voters regarding their vote on the ground that contestants feared that these voters might have lied to preserve the election. This argument was squarely rejected in *Russell* v. *McDowell, supra,* 83 Cal. 70, 73: "He [contestant] also argues with equal force, that there is but one means of proving how the illegal voter has cast his vote; that is to say, by his own testimony, which is more likely to be false than true; and consequently that the attempt to prove how illegal votes have been cast can only result in an aggravation of the fraud. But what consequence would he have us deduce from this reasoning? . . . In truth, a court can do nothing better, in the absence of proof as to how illegal votes have been cast, than to make the apportionment as was done in this case . . . ."

The majority overlook the trial judge's ability to make credibility determinations of the nature involved herein; no judge is obligated to accept at face value the "self-serving" testimony of a witness interested in the litigation's outcome. Had contestants fulfilled their obligation to examine voters directly regarding their vote, cross-examination (supported by the voter's signature on the petition) might well have weakened or impeached an unfavorable response. (See *Garrison* v. *Rourke,* 32 Cal.2d 430, 442 [196 P.2d 884], and *Smith* v. *Thomas, supra,* 121 Cal. 533, 536, wherein the testimony of illegal voters was successfully impeached in this manner.)

The record shows that contestants voluntarily chose not to ask the illegal voters how they voted. Contestants initially examined four voters before asking any voter how he voted. Upon asking voter Eva M. Lopez how she voted, respondents made the following proper objection: "That's an objectionable question, Your Honor, unless there's a clear ruling by the Court that this vote is illegally cast. . . . If the vote is legally cast, under the constitution the voter is not required to answer."

The court sustained the objection, and ultimately found Mrs. Lopez not to have been an illegal voter. Respondents' objection was well taken. As stated in the case upon which the majority rely, *Robinson* v. *McAbee, supra,* "Of course, such a person [a challenged voter] will not be compelled to testify as to the person for whom he voted until it is clearly shown he voted illegally. And so long as the question as to the legality of his vote is in doubt, he cannot be compelled to make the disclosure." (64 Cal.App. at p. 715; accord, McCrary, Elections, *supra,* §§ 490-492.)

After examining Mrs. Lopez, contestants examined four more voters without asking them how they voted. Then, voter Donald Epperson was asked whether or not he told one Robert Reed that he, Epperson, had voted in favor of consolidation. Again, respondents objected, solely on the ground that Epperson had not yet been shown to be an illegal voter. The court agreed that there was a "serious question" whether Epperson was a legal voter, and sustained the objection, stating that "Well, *at this point* I don't feel that there's sufficient foundation *yet* laid to establish domicile one way or the other, and I'll sustain the objection *at this time.*" (Italics added.) Contestants thereafter examined Epperson further, excused him, and never recalled him, even though the court's ruling had made it unmistakably clear that contestants could ask Epperson and other voters how they voted upon establishing their status as illegal voters. Thereafter, six more voters were examined, but contestants did not examine them regarding how they had voted. Then, Louis E. Gonzales, shown to have been an illegal voter, was asked how he cast his vote, was permitted by the court to answer, and replied that he voted *against* consolidation. Finally, six more voters were questioned, but contestants chose not to ask them how they voted.

Once all voters had been examined, contestants moved to admit into evidence the petition for consolidation and explained that in their view, testimony from illegal voters regarding their vote should not be accorded any weight and that contestants were relying exclusively upon the circumstantial evidence which the petition afforded. Thus the record conclusively establishes that contestants voluntarily made a tactical decision not to inquire of most illegal voters regarding their vote. Under the rule of the cases dis-

cussed above, and under Evidence Code sections 412 and 413, the trial court properly granted respondents' motion for judgment.

I would affirm the judgment below.

Wright, C. J., and McComb, J., concurred.