[No. A022404. First Dist., Div. Two. May 21, 1986.]

CITIZENS AGAINST RENT CONTROL et al.,
Plaintiffs and Respondents, v.
CITY OF BERKELEY et al., Defendants and Appellants.

214

216

### COUNSEL

Manuela Albuquerque and Natalie E. West, City Attorneys, for Defendants and Appellants.

Nielsen, Hodgson, Parrinello & Mueller, James R. Parrinello, John E. Mueller and Marguerite Mary Leoni for Plaintiffs and Respondents.

### OPINION

**SMITH, J.**—Plaintiffs in this action to invalidate a Berkeley ordinance that placed dollar amount limits on contributions to campaign committees for or against municipal ballot measures ultimately prevailed on appeal to the United States Supreme Court (*Citizens Against Rent Control* v. *Berkeley* (1981) 454 U.S. 290 [70 L.Ed.2d 492, 102 S.Ct. 434]) from a decision of our state Supreme Court that had upheld the ordinance. Upon issuance of remittitur to the superior court, plaintiffs moved for an award of attorney fees under the private attorney general statute, Code of Civil Procedure section 1021.5. By two orders, the superior court awarded $209,514.50 in attorney fees and $14,539.88 in costs, which amounts included costs and fees for plaintiffs' litigation before the United States Supreme Court. Defendants, the City of Berkeley, its city council and its fair campaign practices commission, appeal from those orders.

We will reverse the award of printing costs for the federal high court appeal but affirm the awards in all other respects.

## BACKGROUND

A brief summary of the underlying litigation is necessary. For convenience, we borrow in part from the opinion of the United States Supreme Court: "The voters of Berkeley . . . adopted the Election Reform Act of 1974, Ord. No. 4700-N. S., by initiative. The campaign ordinance so enacted placed limits on expenditures and contributions in campaigns involving both candidates and ballot measures. Section 602 of the ordinance provides:

" 'No person shall make, and no campaign treasurer shall solicit or accept, any contribution which will cause the total amount contributed by such person with respect to a single election in support of or in opposition to a measure to exceed two hundred and fifty dollars ($250).'

"[Respondent] Citizens Against Rent Control [CARC] is an unincorporated association formed to oppose a ballot measure at issue in the April 19, 1977, election. The ballot measure would have imposed rent control on many of Berkeley's rental units. To make its views on the ballot measure known, [CARC] raised more than $108,000 from approximately 1,300 contributors. It accepted nine contributions over the $250 limit. Those nine contributions totaled $20,850, or $18,600 more than if none of the contributions exceeded $250. Pursuant to § 604 of the ordinance, [appellant] Berkeley Fair Campaign Practices Commission, 20 days before the election, ordered [respondent CARC] to pay $18,600 into the city treasury.

"Two weeks before the election, [CARC] sought and obtained a temporary restraining order prohibiting enforcement of §§ 602 and 604. The ballot measure relating to rent control was defeated." (*Citizen Against Rent Control v. Berkeley, supra,* 454 U.S. 290, 292-293 [70 L.Ed.2d 496-497], fns. omitted, bracketed material added.)

A preliminary injunction issued, after which respondents amended their complaint to include a request for attorney fees under section 1988 of title 42 of the United States Code for alleged civil rights violations (42 U.S.C. §§ 1982-1983).[1] Summary judgment declaring section 602 of the ordinance

---

[1]As amended by Civil Rights Attorney's Fees Act of 1976 (90 Stat. 2641), section 1988 provides in part: "In any action or proceeding to enforce a provision of sections 1981, 1982, 1983, 1985, and 1986 of this title, . . . the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs." (42 U.S.C. § 1988.)

unconstitutional as violative of respondents' rights under the First Amendment of the federal Constitution and article I, section 2, of the state Constitution was entered in September 1977, and appellants timely appealed to this court.

On January 1, 1978, pending the appeal, newly enacted section 1021.5 of the Code of Civil Procedure (hereafter cited only as section 1021.5) went into effect.[2] This court unanimously affirmed the superior court judgment in an opinion filed on December 13, 1979.[3] Respondents made no motion for attorney fees. Appellants then sought and were granted a hearing in the California Supreme Court. In an opinion filed August 7, 1980, that court reversed the superior court judgment, deciding four to three that the ordinance was constitutionally valid under both the federal and state Constitutions in that the contribution limit was necessary to serve a compelling governmental interest in preserving the integrity of the state initiative and referendum process and was not unduly restrictive. (*Citizens Against Rent Control* v. *City of Berkeley* (1980) 27 Cal.3d 819, 832 [167 Cal.Rptr. 84, 614 P.2d 742].)

On appeal, the United States Supreme Court reversed the state high court's decision, concluding on the record before it that the ordinance did not advance a legitimate governmental interest significant enough to justify its infringement of First Amendment rights of association and expression. (*Citizens Against Rent Control* v. *Berkeley, supra,* 454 U.S. 290, 299-300 [70 L.Ed.2d 492, 500-501].) The case was remanded to the California Supreme Court (*id.,* at p. 300 [70 L.Ed.2d at p. 501]) with the mandate that respondents (appellants therein) recover $4,589 in costs, representing clerk's costs of $300 plus $4,289 for the costs of printing the record. No award of attorney fees was made or requested.

On remand, the California Supreme Court vacated its prior decision, affirmed the superior court judgment and issued remittitur, ordering that respondents "shall recover costs on appeal."

---

[2]"Upon motion, a court may award attorneys' fees to a successful party against one or more opposing parties in any action which has resulted in the enforcement of an important right affecting the public interest if: (a) a significant benefit, whether pecuniary or nonpecuniary, has been conferred on the general public or a large class of persons, (b) the necessity and financial burden of private enforcement are such as to make the award appropriate, and (c) such fees should not in the interest of justice be paid out of the recovery, if any. With respect to actions involving public entities, this section applies to allowances against, but not in favor of, public entities, and no claim shall be required to be filed therefor." (§ 1021.5.)

[3]Justice Rouse authored the opinion, in which then Presiding Justice Taylor and the late Justice Miller concurred.

On May 6, within 30 days following the remittitur, respondents filed notice of their intent to seek attorney fees and related expenses totaling $213,212.89 pursuant to section 1021.5. They also filed a costs memorandum by which (after later adjustments for duplicated items) they claimed appellate court costs totaling $14,539.88, of which $9,715.08 represented costs for printing briefs on their appeal to the United States Supreme Court— costs which that court had not awarded.

Appellants filed a motion to tax costs about two weeks later, objecting to the claims for costs in the federal high court but not disputing the remaining amounts.[4] On May 21, they filed opposition to the attorney fees claim as well on grounds that the court was without jurisdiction to make the award, respondents having failed to bring their claim in the appellate courts and the state Supreme Court's remittitur having directed only the recovery of "costs" on appeal (see Cal. Rules of Court, rule 26). Appellants asked that, should the court find it had such jurisdiction, discovery be permitted in order to identify any duplicative or excessive charges and to assess the "financial burden of private enforcement" component of section 1021.5. (See fn. 2, *ante.*) At a hearing held on May 27, after written responses had been filed on both sides, the parties argued both the costs and fees issues, and the matters were submitted. Appellants renewed their request that discovery be allowed should the court decide to award attorney fees.

On June 21, the court ordered fees allowed, in an amount to be determined on written justification from respondents, and ordered costs awarded in the amount requested. The order gave respondents 10 days to file their written justification and appellants until two weeks beyond that time to file opposition.

Justification, consisting in part of an extensive declaration by attorney James R. Parrinello detailing the efforts of attorneys and other personnel on the case, and a year-by-year breakdown of total hours spent by each attorney, was timely filed. Fees for 1977 (previously overlooked in preparing an earlier fees memorandum) were added, and certain other fees and expenses previously requested were withdrawn, leaving a net downward adjustment of the requested total to $209,514.50 plus related expenses of $1,644.25. Attached to the declaration was a copy of a letter, dated June 25, in which

---

[4]The undisputed amounts were $235.80 for the appeal to this court and $4,589 for costs previously mandated by the United States Supreme Court.

Mr. Parrinello offered to make time reports available after June 30 for respondents' inspection.[5]

In opposition filed July 21, appellants objected to the amount of fees requested for the United States Supreme Court appeal (while adhering to their jurisdictional arguments). They expressly conceded that the fees claimed for all phases of the litigation *preceding* that appeal were reasonable but argued that the amount claimed for the federal court phase ($179,596) represented excessive and duplicate numbers of hours. It is internally evident from the filed opposition that respondents had by then turned over copies of their daily time sheets and billing records to appellants and that appellants had relied on those records in fashioning their opposition.[6]

On August 27, after considering a further declaration by Mr. Parrinello, the superior court filed its final orders (1) denying appellants' motion to tax costs and awarding costs of $14,539.88, the full amount requested, and (2) awarding attorney fees of $209,514.50, the requested amount of fees less the claimed "related expenses" figure. This appeal timely followed notice of entry of the orders. ■ Both orders are appealable as orders after judgment. (Code Civ. Proc., § 904.1, subd. (b); *Marini* v. *Municipal Court* (1979) 99 Cal.App.3d 829, 831 [160 Cal.Rptr. 465] [§ 1021.5 fees]; *Markart* v. *Zeimer* (1925) 74 Cal.App. 152, 155-158 [239 P. 856] [costs on appeal]; cf. *Harmon* v. *Pacific Tel. & Tel. Co.* (1962) 201 Cal.App.2d 453, 454-456 [20 Cal.Rptr. 118] [same].)

APPEAL

I

■ Appellants first challenge the $9,715.08 awarded for costs of printing briefs filed in the United States Supreme Court. They argue that re-

---

[5]The body of the letter, written to former Berkeley City Attorney Natalie West, reads:

"In the interests of mutual cooperation and to facilitate your response concerning our written justification of attorneys' fees, we will make available to you at our offices upon 24-hour notice our time reports concerning time spent by attorneys and other personnel on this case.

"We are now organizing these records so that they will be more easily reviewed; they will be available after June 30. Please call either myself or Marguerite Leoni if you desire to review these records."

[6]Although the opposition was not filed until July 21, it is dated July 16. Thus, respondents' time and billing records were in appellants' possession sometime before July 16. By a stipulated augmentation, copies of those records have been made a part of the appellate record. The parties stipulate that those records were lodged with the superior court (see Cal. Rules of Court, rule 12(a)) in connection with respondents' written justification, and the court's final order awarding fees recites that the records were in fact considered.

spondents were entitled only to those costs allowed them by the federal court's mandate, pursuant to that court's rules, which expressly disallow printing costs for briefs,[7] and that the superior court's attempted award of such costs was invalid even if authorized by state law. We agree and therefore do not address appellants' further contention that state law (Cal. Rules of Court, rule 26(a)) in fact does not authorize such an award.

"[T]he matter of costs in federal courts is controlled exclusively by United States statutes or rules of the federal courts where such statutes or rules exist." (*Sacramento M. U. Dist.* v. *P. G. & E. Co.* (1942) 20 Cal.2d 684, 688 [128 P.2d 529], cert. den. (1943) 318 U.S. 759 [87 L.Ed. 1132, 63 S.Ct. 530].) On the theory that state-authorized awards of costs incurred in federal courts might impede free access to federal forums, such awards have been held invalid where the items of cost are comprehensively covered but not allowed by federal statute or rule. (*Id.*, at p. 690; *Henkel* v. *Chicago, etc. Ry.* (1932) 284 U.S. 444, 445-448 [76 L.Ed. 386, 387-389, 52 S.Ct. 223]; *Missouri Pacific Ry. Co.* v. *Larabee* (1914) 234 U.S. 459, 470-473 [58 L.Ed. 1398, 1406-1407, 34 S.Ct. 979].) That proscription has been no bar to state-authorized awards of *attorney fees*, which, though often connoted "costs" in one sense, are not the sort of costs generally contemplated by federal costs regulation. (*Sioux County* v. *Nat. Surety Co.* (1928) 276 U.S. 238, 243-244 [72 L.Ed. 547, 550-551, 48 S.Ct. 239]; *Henkel* v. *Chicago, etc. Ry., supra,* 284 U.S. at pp. 447-448 [76 L.Ed. at pp. 388-389]; *Sacramento M. U. Dist.* v. *P. G. & E. Co., supra,* 20 Cal.2d at pp. 690-693.)

The costs of printing briefs filed in the federal Supreme Court are expressly contemplated—and made nonrecoverable—by that court's rules (see fn. 7, *ante*), promulgated under the authority of federal statute (28 U.S.C. § 2071). The superior court therefore erred in awarding that item of costs. (*People ex rel. Cooper* v. *Mitchell Brothers' Santa Ana Theater* (1985) 165 Cal.App.3d 378, 390 [211 Cal.Rptr. 501], cert. den. (1985) — U.S. — [88 L.Ed.2d 293, 106 S.Ct. 347]; see *Jorgensen* v. *Standard Oil Co. of New Jersey* (1942) 178 Misc. 740 [36 N.Y.S.2d 318, 319].)

Respondents ask us to take judicial notice of two state Supreme Court cases in which federal-court brief printing costs were awarded in conjunction

---

[7]United States Supreme Court Rule 50.3 (28 U.S.C.) provides: "The fees of the Clerk and the costs of serving process and printing the joint appendix in this Court are taxable items. The costs of the transcript of record from the court below is also a taxable item, but shall be taxable in that court as costs in the case. *The expenses of printing briefs, motions, petitions, or jurisdictional statements are not taxable.*" (Italics added.)

with section 1021.5 attorney fee awards. We conclude, however, that neither award has precedential value.

One such award appears from the third and fourth Supreme Court installments of the protracted *Serrano* litigation (*Serrano* v. *Priest* (1977) 20 Cal.3d 25 [141 Cal.Rptr. 315, 569 P.2d 1303] (*Serrano III*); *Serrano* v. *Unruh* (1982) 32 Cal.3d 621 [186 Cal.Rptr. 754, 652 P.2d 985] (*Serrano IV*)).[8] In its third *Serrano* decision, the Supreme Court affirmed a section 1021.5 fee award for trial court services and directed the superior court to consider class action plaintiffs' further section 1021.5 fees claim against state and county defendants for appellate services (*Serrano III, supra,* 20 Cal.3d at p. 50), which included a claim for services in opposing county defendants' unsuccessful petition for certiorari in the federal Supreme Court from the second *Serrano* decision. (*Serrano IV, supra,* 32 Cal.3d at p. 625; see *Serrano* v. *Priest, supra,* 18 Cal.3d 728.) The superior court subsequently made an award which included partial costs against county defendants for the expense of printing the brief in opposition to the petition for certiorari. (*Serrano IV, supra,* 32 Cal.3d at p. 625.) The state Supreme Court never had occasion to review that part of the award, however. By the time of the fourth *Serrano* decision, which reviewed the intervening award, county defendants had settled out and abandoned their appeal. (*Id.,* at p. 626.) ■ Since the propriety of awarding printing costs was never considered, the case does not stand as authority for the award. (*Canales* v. *City of Alviso* (1970) 3 Cal.3d 118, 127-128, fn. 2 [89 Cal.Rptr. 601, 474 P.2d 417].)

■ Another award of brief printing costs apparently was made in the aftermath of *Bakke* v. *Regents of University of California* (1976) 18 Cal.3d 34 [132 Cal.Rptr. 680, 553 P.2d 1152] (affd. in part and revd. in part in *University of California Regents* v. *Bakke* (1978) 438 U.S. 265 [57 L.Ed.2d 750, 98 S.Ct. 2733].) Respondents call to our attention an unpublished order of the California Supreme Court filed after the federal high court's review. The order directs the superior court to determine and award Bakke reasonable amounts for the expenses of printing briefs and for attorney fees in the federal court proceedings. The order, having not been published, carries no precedential significance. (Cal. Rules of Court, rules 977(a) and (b).) Moreover, even if the award had been published, we have no indication that the Supreme Court considered arguments against the award so that we

---

[8]The first and second installments were *Serrano* v. *Priest* (1971) 5 Cal.3d 584 [96 Cal.Rptr. 601, 487 P.2d 1241, 41 A.L.R.3d 1187], and *Serrano* v. *Priest* (1976) 18 Cal.3d 728 [135 Cal.Rptr. 345, 557 P.2d 929], cert. den. (1977) 432 U.S. 907 [53 L.Ed.2d 1079, 97 S.Ct. 2951].)

could rely on it as authority. (*Canales* v. *City of Alviso, supra,* 3 Cal.3d 118, 127-128, fn. 2.)

The award of federal court brief printing costs must be stricken.

## II

Appellants raise numerous arguments against the court's award of section 1021.5 attorney fees. We turn first to their contention that the superior court lacks jurisdiction to consider a section 1021.5 motion made, as here, for the first time on remittitur following exhaustion of appellate review.[9]

■ Relying on decisions where the appellate court either (1) reviews the disposition of a section 1021.5 fee request made at trial (see, e.g., *Press* v. *Lucky Stores, Inc.* (1983) 34 Cal.3d 311 [193 Cal.Rptr. 900, 667 P.2d 704], *passim; Baggett* v. *Gates* (1982) 32 Cal.3d 128, 142-144 [185 Cal.Rptr. 232, 649 P.2d 874]), (2) remands for the trial court's consideration a request first made in the appellate court (see, e.g., *Serrano III, supra,* 20 Cal.3d 25, 49-50; cf. *Rumford* v. *City of Berkeley* (1982) 31 Cal.3d 545, 559 [183 Cal.Rptr. 73, 645 P.2d 124]) or (3) considers for itself a request made on appeal (see, e.g., *Pacific Legal Foundation* v. *California Coastal Com.* (1982) 33 Cal.3d 158, 166 [188 Cal.Rptr. 104, 655 P.2d 306]; cf. *People* ex rel. *Seal Beach Police Officers Assn.* v. *City of Seal Beach* (1984) 36 Cal.3d 591, 602 [205 Cal.Rptr. 794, 685 P.2d 1145]), appellants extrapolate an asserted jurisdictional rule that unless a request for fees is first made at trial or in an appellate court which then specifically remands the matter for consideration of the request, the superior court has no power to hear a request on remittitur. The argument is misguided.

Because a section 1021.5 fee request does not create a new cause of action but is ancillary to the underlying litigation (*Serrano IV, supra,* 32 Cal.3d 621, 636-637), a trial court has jurisdiction to entertain the request even when it is first made after judgment becomes final. (*Marini* v. *Municipal Court, supra,* 99 Cal.App.3d 829, 834-835.) Indeed, because section 1021.5 "requires the claimant to show that the principal action 'has resulted' in the enforcement of an important right and that a significant benefit 'has been conferred'" (see fn. 2, *ante*), that showing often "cannot be made until the benefit is secure, in some cases after judgment is final." (*Folsom* v. *Butte County Assn. of Governments* (1982) 32 Cal.3d 668, 679 [186

---

[9]In a letter filed just before oral argument and again at oral argument itself, appellants abandoned a broader contention that, regardless of the timing of the motion, the superior court lacks jurisdiction to award fees for federal Supreme Court services under section 1021.5.

Cal.Rptr. 589, 652 P.2d 437], citing *Marini* v. *Municipal Court, supra,* at p. 835.) Section 1021.5 thus confers jurisdiction by implication so that a request "*need not* be made" before finality. (*Marini* v. *Municipal Court, supra,* at p. 835; see *Serrano IV, supra,* 32 Cal.3d 621, 639, fn. 30.)[10]

The benefits of this litigation were not secure until the United States Supreme Court's decision became final, and a motion for section 1021.5 attorney fees necessarily had to await remand to a state court. It is true that respondents could have moved the state Supreme Court sometime during the approximate two months between remand and issuance of the remittitur, but they were not required to do so. Section 1021.5 "provides a special motion procedure plainly intended to be initiated after the result of the action is known but *subject to no express time limit.*" (*Marini* v. *Municipal Court, supra,* 99 Cal.App.3d 829, 834, italics added; *No Oil, Inc.* v. *City of Los Angeles* (1984) 153 Cal.App.3d 998, 1006 [200 Cal.Rptr. 768].) Moreover, as a practical matter in this case, no time savings or other significant advantage would probably have been gained. In all likelihood, the state Supreme Court would have followed its usual practice of remanding the matter to the superior court to set the *amount* of fees, even assuming that it might have determined for itself that some award was called for. (*Saleeby* v. *State Bar* (1985) 39 Cal.3d 547, 574-575 [216 Cal.Rptr. 367, 702 P.2d 525].) We hold that the request for fees was properly considered by the superior court on remittitur, despite no request having been previously made and despite lack of a specific directive in the remittitur.[11]

We do not suggest that a litigant may unfairly delay a fee request to the surprise and disadvantage of an opponent. (See *Green* v. *Obledo* (1984) 161 Cal.App.3d 678, 683 [207 Cal.Rptr. 830], cert. den. (1985) — U.S. — [88 L.Ed.2d 54, 106 S.Ct. 67]; see also *White* v. *New Hampshire Dept. of Empl. Sec.* (1982) 455 U.S. 445, 452 [71 L.Ed.2d 325, 102 S.Ct. 1162].) Whether to award attorney fees under section 1021.5 lies within the court's discretion. (*Slayton* v. *Pomona Unified School Dist.* (1984) 161 Cal.App.3d 538, 545 [207 Cal.Rptr. 705].) There would appear to be room

---

[10]A panel of this court held in *Committee for Sewer Referendum* v. *Humboldt Bay Wastewater Authority* (1978) 77 Cal.App.3d 117, at page 125 [143 Cal.Rptr. 463], that an appellant who first moved for section 1021.5 fees on appeal to this court was precluded from seeking fees for services rendered in the trial court because the issue was never raised below. The matter was remanded for consideration of whether fees *on appeal only* were appropriate. (*Ibid.*) That decision, rendered only days after section 1021.5 took effect and without the benefit of the subsequently developed rationale discussed above, is obviously wrong in retrospect. It is disapproved.

[11]The discussion above also serves to refute appellants' closely related argument that the superior court impermissibly *exceeded the scope* of the remittitur, which directed only an award of "costs on appeal."

in the exercise of that discretion, despite lack of an express statutory time limit, to take into account unfair surprise occasioned by unexcused delay. However, while appellants in this case vigorously contend that they were unfairly surprised by the lack of any prior motion under section 1021.5, the record speaks otherwise.

Section 1021.5 took effect in January 1978 when this case was first pending on appeal before this court. ██ ██ Thus, while the provision applies retrospectively in this case to allow recovery of trial court fees (*Woodland Hills Residents Assn., Inc.* v. *City Council* (1979) 23 Cal.3d 917, 931-932 [154 Cal.Rptr. 503, 593 P.2d 200]), respondents had no opportunity to invoke the provision in the trial court. However, in an April 1977 amendment to their complaint, they did pray for an award of reasonable attorney fees under the federal statute (42 U.S.C. § 1988) for redressing alleged violations of their civil rights. Thus, appellants had early notice of respondents' intention to seek attorney fees, and they cannot now claim unfair surprise. The fact that respondents later chose to rely instead on section 1021.5 is of little consequence.[12] In view of the similarity of calculations required for awards under the state and federal statutes, one court has recently held that the converse situation—an election to rely on the federal statute where only the state statute was originally invoked at trial—did not disadvantage the defendants. (*Green* v. *Obledo, supra,* 161 Cal.App.3d 678, 683 & fn. 3; contrast *Beach Colony II* v. *California Coastal Com.* (1985) 166 Cal.App.3d 106, 116-117 [212 Cal.Rptr. 485] [§ 1988 claim on appeal rejected for lack of trial court findings on any "special circumstances" that might preclude an award under federal law].) Also, respondents were not guilty of long delay in seeking fees after the judgment was final. They filed about four months after the federal court issued its mandate and within 30 days following the state high court's remittitur. We cannot say that the superior court abused its discretion in awarding fees over appellants' claim of surprise.

## III

On the merits of the fee award, appellants contend that two of the section 1021.5 criteria were not satisfied in that (1) respondents' efforts have not conferred a significant benefit on the general public or a large class of persons, and (2) respondents vindicated their own economic interests so that it was inappropriate to award them anything. Both points are meritless.

---

[12]State and federal courts have concurrent jurisdiction to award fees under the federal statute. (42 U.S.C. § 1988; *Maine* v. *Thiboutot* (1980) 448 U.S. 1, 11-12 [65 L.Ed.2d 555, 563-564, 100 S.Ct. 2502].) Appellants therefore had no reason to believe that the matter of fees was over once the United States Supreme Court proceedings were over.

■ The United States Supreme Court concluded that "[t]he restraint [contribution limit] imposed by the Berkeley ordinance on rights of association and in turn on individual and collective rights of expression plainly contravenes both the right of association and the speech guarantees of the First Amendment." (*Citizens Against Rent Control* v. *Berkeley, supra,* 454 U.S. 290, 300 [70 L.Ed.2d 494, 501].)

The fundamental constitutional stature of the rights vindicated here establishes beyond question that an "important right" has been enforced. (*Press* v. *Lucky Stores, Inc., supra,* 34 Cal.3d 311, 318.) Further, the enforcement of First Amendment rights—rights which are by nature individual rights—nevertheless benefits society as a whole, i.e., the general public. (*Id.,* at p. 319.) In fact, the instant litigation set national precedent.

■ Next, appellants suggest that the "public benefit" criterion was not satisfied here because respondents vindicated their own economic interests— i.e., the protection and enhancement of private realty interests that the defeat of rent control would presumably bring—and only incidentally vindicated First Amendment rights of the public. (See, e.g., *Pacific Legal Foundation* v. *California Coastal Com., supra,* 33 Cal.3d 158, 167 [resolution of "taking" issue was incident to plaintiffs' objective of invalidating a costly land use permit condition affecting only their property]; *Beach Colony II Limited* v. *California Coastal Com., supra,* 166 Cal.App.3d 106, 112-115; see also *Press* v. *Lucky Stores, Inc., supra,* 34 Cal.3d 311, 319-320, fn. 7 [distinguishing *Pacific Legal Foundation* as affecting only personal economic interests and not involving rights as fundamental as equal protection or freedom of speech and petition rights].)

We find the "public benefit" criterion satisfied. Respondents' economic interests, while initially motivating their challenge to the ordinance, were protected once the ordinance was enjoined in time for the April 1977 election. The rent control initiative was defeated by the voters, yet respondents persisted for four more years to insure that the contribution limit could never again be enforced. It would be shortsighted to view this litigation as directed totally or even primarily toward the vindication of private economic interests.[13] Respondents vindicated fundamental constitutional rights that

---

[13]"That plaintiffs' personal interests in the outcome of the . . . initiative were sufficient to induce them to bring this action is irrelevant. As the statute makes clear, subdivision (b) of section 1021.5 focuses not on plaintiffs' abstract personal stake, but on the financial incentives and burdens related to bringing suit. Indeed, in the absence of some concrete personal interest in the issue being litigated, the putative plaintiff would lack standing to bring an action. [Citation.]" (*Press* v. *Lucky Stores, Inc., supra,* 34 Cal.3d 311, 321, fn. 11.)

will now be directly enjoyed by many in future Berkeley elections and indirectly enjoyed by society as a whole. (*Press* v. *Lucky Stores, Inc., supra,* 34 Cal.3d 311, 319-320, fn. 7.)

■ Finally, citing their suspicions that "this litigation was funded by contributions from real estate interests," appellants argue that the "financial burden of private enforcement" is not such as to make an award appropriate (§ 1021.5). They also argue that respondents—many or perhaps all of whom owned rental properties—anticipated that rent control would bring about decreased rental property values and so were sufficiently motivated to pursue this litigation even if the prospect of an attorney fee award had not existed. Thus, they assert, this is not a case where the policy of section 1021.5 to encourage public interest litigation is well served, even if the results obtained did serve the public in general.

We recognize that the vindication of important public rights, even for a large segment of the populace, does not necessarily satisfy the "financial burden of private enforcement" criterion. However, this case is far different from those in which that criterion has been found unsatisfied. (See, e.g., *Beach Colony II Limited* v. *California Coastal Com., supra,* 166 Cal.App.3d 106, 112-115 [despite vindication of important public right regarding unconstitutional permit conditions, public benefit was merely incidental to developer's direct and substantial financial benefit in being freed from condition].)

The question is whether the cost of the claimant's victory transcends his personal interest—that is, whether the burden on the claimant was out of proportion to his individual stake. (*Woodland Hills Residents Assn., Inc.* v. *City Council, supra,* 23 Cal.3d 917, 941.) Here, there was no direct pecuniary benefit from the litigation. Any benefit in the form of preventing erosion of property values was at least once removed from the results of the litigation in that freedom from the contribution limit by no means guaranteed defeat of the initiative measure, only the chance to more vigorously oppose its passage. Also, the amount of any monetary advantage was speculative. Moreover, respondents' motivations clearly extended beyond preventing rent control. Rent control became a reality in Berkeley by 1979 (*Fisher* v. *City of Berkeley* (1984) 37 Cal.3d 644, 652, 677, fn. 30 [209 Cal.Rptr. 682, 693 P.2d 261], affd. *Fisher* v. *City of Berkeley, Cal.* (1986) 475 U.S. 260 [89 L.Ed.2d 206, 106 S.Ct. 1045]), when the case was still before this court the first time. Respondents thereafter continued to defend their judgment before both the state and federal high courts. On these facts, appellants' argument of financial motivation disintegrates into a claim that property owners are cut off from the benefits of section 1021.5

whenever they pursue litigation that might someday help them further or secure their property interests. The claim is untenable.

We also must reject the argument that voluntary financial contributions to the ongoing litigation by nonparty property owners or associations (facts which appellants assert that they could have established through discovery) affect the analysis of financial burden. The inquiry is whether respondents had an *individual stake* that was out of proportion to the costs of the litigation (*Baggett* v. *Gates, supra,* 32 Cal.3d 128, 142), not whether they were financially able to bear the costs. Financial status is not the criterion. (*American Federation of Labor* v. *Employment Dev. Dept.* (1979) 88 Cal.App.3d 811, 822 [152 Cal.Rptr. 193] [rejecting argument that union plaintiffs were "well able to meet the costs" of the action].)

IV

Appellants raise two interrelated policy arguments against the fee award. First, citing the substantial size of the award in this case, they call to our attention three other pending lawsuits directed against Berkeley voter-initiated measures and predict that cumulative high awards could seriously erode the city's limited resources. They point out that the city attorney is obligated to defend such actions.

This panel recently held, in the face of similar arguments by a school district, that there is no "good faith" exception to the private-attorney-general doctrine and that "good faith" is similarly not a special circumstance that would make an award unjust. (*Schmid* v. *Lovette* (1984) 154 Cal.App.3d 466, 474-476 [201 Cal.Rptr. 424].) "The fact that the fee award must be paid from the limited budget of the district and that the financial burden will therefore fall upon the taxpayers also does not constitute a special circumstance rendering the fee unjust . . . ." (*Id.*, at p. 476, citation omitted; see fn. 14, *post.*) The city's good faith, like the school district's in *Schmid,* cannot shield it, although the court making the award is certainly entitled to consider financial burden on a city as one guide to the exercise of its discretion in setting the amount (though not the propriety) of the award. (*Serrano III, supra,* 20 Cal.3d 25, 49.)

The second argument is that, in light of the strong public policy favoring the initiative process and the asserted danger that fee awards might chill the exercise of that process, this court should "adopt a different standard for awarding attorney fees in cases involving measures passed by initiative than the court might apply to cases invalidating ordinances passed by [a] legislative body [like a city council]." (Cf. *Fair Political Practices Com.*

v. *Superior Court* (1979) 25 Cal.3d 33, 40-41 [157 Cal.Rptr. 855, 599 P.2d 46], cert. den. (1980) 444 U.S. 1049 [62 L.Ed.2d 736, 100 S.Ct. 740].) Appellants observe that the subject matter of initiatives may often be innovative and legally undefined; that initiatives are often drafted without legal advice; that under their city charter an initiative measure, once enacted, cannot be amended except by a vote of the people; and that in litigating over an initiative measure, a city does not have the "luxury of choice" but must "carry out the will of the People by defending initiative measures until the legal issues have been finally resolved by the courts."

Appellants do not suggest what "different standard" might apply. Nevertheless, considering the well-defined statutory criteria and policy governing section 1021.5 fee awards, our answer to their concerns must be, again, that such considerations may properly help direct a court's exercise of discretion in determining the amount, though not the propriety, of an award. It is the Legislature's business—not ours—to rewrite the statutory criteria.[14]

V

Appellants contend that the award of $209,514.50 is "excessive on its face." It is not.

"*Serrano III* requires the trial court to first determine a 'touchstone' or 'lodestar' figure based on a 'careful compilation of the time spent and reasonable hourly compensation for each attorney . . . involved in the presentation of the case.' [Citations.] That figure may then be increased or reduced by the application of a 'multiplier' after the trial court has considered other factors concerning the lawsuit. [Fn. omitted.]" (*Press* v. *Lucky Stores, Inc., supra,* 34 Cal.3d 311, 322.)

Respondents submitted summaries of hours spent by each attorney, paralegal and law clerk for each of the years 1977 through 1981, showing the hourly rate charged for each person in the given year. In two declarations, respondents' lead counsel, Mr. Parrinello, detailed the nature and procedural history of the action and the services performed by each attorney at various stages of the litigation, from early research through argument in the federal high court. He documented the experience of the attorneys and the types of research and other services performed. Also submitted were photocopies of all time slips and billing printouts, which together comprised over 200

---

[14]Two attempts to amend section 1021.5 to require consideration of a nonprevailing party's "good faith and cooperation" as one factor, among others, "in determining the *appropriateness of the award* or its size" have failed. (Italics added.) (Assem. Bill No. 3172 (1979-1980 Reg. Sess.) § 1; Assem. Bill No. 661 (1981-1982 Reg. Sess.) § 1.)

pages of documentation. A total requested amount of fees was reached by multiplying the number of hours for each person by that person's billing rate at the time the service was performed, which yielded a combined figure of $209,514.50. Respondents made clear to the court that they were not seeking enhancement of that figure (i.e., use of a "multiplier"). Appellants, on the other hand, sought diminution of that figure to $30,000. In an order that recited all the documentary evidence and arguments considered, the court awarded the exact figure as calculated in respondents' papers.[15]

Appellants argue that both the court's determination that the requested fees were reasonable and its obvious refusal to diminish the requested amount are unsupported by specific, adequate findings and hence cannot stand. However, appellants never requested findings, and they cite no authority for their position that the court was obligated to make findings on its own. Our review standard is abuse of discretion (*Serrano III, supra,* 20 Cal.3d 25, 49), which will be found only where no reasonable basis for the court's action is shown. (*Beach Colony II Limited* v. *California Coastal Com., supra,* 166 Cal.App.3d 106, 110.) "Where, as here, the court was not asked to, and did not make findings on substantial factual issues, we must infer all findings necessary to support the judgment" and uphold them "if they are based on substantial evidence" in the record. (*Ibid.; San Bernardino Valley Audubon Society, Inc.* v. *County of San Bernardino* (1984) 155 Cal.App.3d 738, 754-755 [202 Cal.Rptr. 423].) This review standard subsumes any argument that an award is excessive on its face. (See *Werschkull* v. *United California Bank* (1978) 85 Cal.App.3d 981, 1005-1007 [149 Cal.Rptr. 829].)

The court's determination of reasonableness inferentially required it to find that, contrary to the claim of respondents, there were no excessive or duplicative hours charged.[16] Appellants argued generally that the number of hours (1,940) billed over the 1-year period between the California Su-

---

[15]The concluding part of the order reads: "The court, having reviewed all pleadings offered in support of and in opposition to plaintiffs' motion for attorneys' fees, plaintiffs' pleading files, including briefs and transcript of oral argument [before the federal Supreme Court], and plaintiffs' time report records lodged with the court, and it appearing that the time dedicated to this litigation by plaintiffs' attorneys was reasonable and necessary in light of the novelty and complexity of the issues, the hourly rates reasonable, and the amount of fees just and reasonable under all the circumstances of this case and proof having been made to the satisfaction of the Court, and good cause appearing therefor, [¶] IT IS ORDERED that: [¶] 1. Plaintiffs shall recover from defendants and defendants shall pay to plaintiffs, the sum of $209,514.50 as and for attorneys' fees."

[16]Appellants concede, as they did in the superior court, that the hourly *rates* charged were reasonable.

preme Court decision in early August 1980 and oral argument before the United States Supreme Court in mid-October 1981 was excessive considering that the issues had already been briefed and presented twice in the state appellate courts. Specifically, they claimed duplicative and excessive time charges in that two attorneys accompanied Mr. Parrinello to Washington, D.C. for oral argument and each billed ten hours per day for the two days before, and the day of, oral argument when only Mr. Parrinello argued to the court.

Substantial evidence of reasonableness exists on both points. As to the general claim of excessive hours for the one-year period, there were complete time records documenting the services rendered. The record shows that, in addition to preparing against arguments in appellants' jurisdictional statement and appendix, motion to dismiss, opening brief and reply brief, respondents had to research and be prepared to address arguments raised in five amicus briefs. Considerable new research was necessary on statistical, sociological and political science topics regarding the effects of campaign spending on the voting and initiative processes—all of which research was painstakingly set out by declaration. As to the specific claim that it was not necessary for three attorneys to be at argument, Mr. Parrinello adequately explained by sworn declaration that extenuating circumstances made it necessary for the other two attorneys to travel with and help prepare him.[17] Moreover, appellants cannot complain of travel, lodging and other expenses for the trip, since those expenses, denoted "related attorney expenses" in the fee request, were denied. That denial, particularly as to the travel expenses of Mr. Parrinello himself, appears to have been a deliberate discretionary choice in appellants' favor.

Next, by awarding the full "touchstone" or "lodestar" amount, the court inferentially found against appellants' assertions that the award should be downwardly adjusted because the case did not present novel or complex questions (*Serrano III, supra,* 20 Cal.3d 25, 49) and/or because the burden of the award would fall to Berkeley's taxpayers (*ibid.*). Again, these implied findings are supported.

---

[17]Mr. Parrinello declared, in response to charges of excess and duplicate hours:
"I had previously argued the case before the Court of Appeal and California Supreme Court. Due to prior commitments, I was out of the country for three weeks from late September until the night of October 8, five days before oral argument. My actual preparation for argument began on my return trip from overseas. For obvious reasons, preparations were intense once I returned and included practice arguments and questions and answers during the flight to Washington at the hotel at night and even on the morning of oral argument. The two attorneys who accompanied me had worked on the case virtually since its inception and greatly assisted in preparing for oral argument."

First, a perusal of the federal high court decision (*Citizens Against Rent Control* v. *Berkeley, supra,* 454 U.S. 290 [70 L.Ed.2d 494]) and the vacated decision of our sharply divided state Supreme Court (*Citizens Against Rent Control* v. *City of Berkeley, supra,* 27 Cal.3d 819) shows that the contribution limit issue was both novel and complex. For appellants to claim otherwise is not only specious, but ironic in light of the zeal and evident conviction with which they pursued their position, even after losing in the trial and first appeal. "[G]overnment 'cannot litigate tenaciously and then be heard to complain about the time necessarily spent by the plaintiff in response.' [Citation.]" (*Serrano IV, supra,* 32 Cal.3d 621, 638, fn. omitted; cf. *Schmid* v. *Lovette, supra,* 154 Cal.App.3d 466, 476.)

Second, we cannot say that the court's refusal to reduce the lodestar figure for taxpayer burden was an abuse of discretion in light of all other relevant considerations. (*Serrano III, supra,* 20 Cal.3d 25, 49.) Although respondents deliberately chose not to seek any upward adjustment of the lodestar figure, they made convincing arguments on each of the other *Serrano III* factors that upward adjustment would have been reasonable. The court could reasonably have found the taxpayer burden factor to be outweighed.

The implied findings are supported; the propriety and amount of the award must therefore be upheld as within the court's discretion.

## VI

 Lastly, appellants contend that an asserted denial of their request for discovery was an abuse of discretion which deprived them of the opportunity to make their case. Specifically, they charge that the court erred in "failing to allow" discovery. In truth, however, the court never prohibited discovery or disallowed any discovery request.

Appellants never moved to conduct particular discovery of any kind. Their request, made in their earliest opposition to attorney fees, was that, should the court decide to make an award, they be allowed to conduct some unspecified discovery to explore the "financial burden of private enforcement" factor and to identify duplicative or excessive charges. The court's tentative ruling of June 21, 1981, thereafter made it clear that an award would be made and that the amount would depend on written justification to be submitted within 10 days. Justification was timely filed on June 30, and a preliminary order of July 28 awarded the requested amount. At no time between the court's tentative ruling and its August 27 final order awarding fees, nor at any time thereafter, did appellants attempt discovery. They had filed opposition on July 21 in which they argued, on a variety of grounds

(all discussed above), that the requested fees were excessive or duplicative, and they made their arguments in reliance on the time records and declarations submitted by respondents. Their opposition made no mention of discovery. At a hearing held on July 27, counsel for appellants repeated their general request that should the court decide to "assert jurisdiction" they "be entitled to some discovery on the amount . . . ." The court's preliminary order filed the next day awarded $209,514.50, yet no discovery was attempted. The final order was not filed until 30 days later, leaving ample time to make a specific discovery request. Had time constraints been a problem, we would expect to see a request for continuance in the record. There is none.

There was no specific discovery request, no refusal and hence no abuse of discretion. We know of no case which requires a court to affirmatively order discovery where none has been specified. Nothing in the record suggests that discovery would have been denied had a specific request been made.

### DISPOSITION

The order awarding costs is modified to reflect a total award of $4,824.80 (representing $14,539.88 less the $9,715.08 erroneously awarded as costs for printing briefs for the United States Supreme Court proceedings) and, as modified, is affirmed.

The order awarding attorney fees is affirmed. Respondents are entitled to further section 1021.5 attorney fees for their efforts in protecting the fee award (*Serrano IV, supra,* 32 Cal.3d 621, 639; *Slayton* v. *Pomona Unified School Dist., supra,* 161 Cal.App.3d 538, 553). Accordingly, the cause is remanded to the superior court to determine and award a reasonable sum, consistent with the views expressed in this opinion.

Because appellants were successful in challenging only one of the two orders from which they appealed, it is appropriate that each side bear its own costs on this appeal (Cal. Rules of Court, rule 26).

Kline, P. J., and Rouse, J., concurred.

Appellants' petition for review by the Supreme Court was denied July 30, 1986.